HERBERT BOEY, as Father and Next Friend for Herbert Boey IV, a Minor, Plaintiff-Appellant, v. DR. ROBERT L. QUAAS, Defendant-Appellee.

Fifth District No. 5—85—0158

Opinion filed January 8, 1986.

Sterling & Stanley, P.C., of Fairview Heights, for appellant.

Richard M. Roessler and William P. Gavin, both of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Plaintiff, Herbert Boey, brought this action in medical malpractice as father and next friend for Herbert Boey IV, against Dr. Robert L. Quaas. The jury returned a verdict for defendant, and plaintiff appeals. The pertinent facts adduced at trial are as follows:

Herbert (Jaron) Boey IV, was born to Herbert and Emma Boey on December 28, 1980. Dr. Quaas was Jaron Boey's pediatrician from December 28, 1980, through October 29, 1981.

Mrs. Boey testified that a few days prior to October 21, 1981, her child developed an intermittent fever. On October 21, 1981, she took him to the emergency room of St. Mary's Hospital and told the emergency room personnel that Jaron had a fever and that he was experiencing intermittent neck pain. The neck pain had begun approximately two days earlier. Jaron Boey was then examined by Dr. Sana Ullah. Dr. Ullah diagnosed Jaron Boey's condition as an ear infection and an elevated temperature. Dr. Ullah stated he telephoned Dr. Quaas, told him the condition of Jaron, and the drugs amoxicillin and tylenol were prescribed. Dr. Ullah stated that Jaron was also given a shot of ampicillin at this time. Jaron returned home with his parents.

On October 23, 1981, Mrs. Boey telephoned Dr. Quaas and informed him that Jaron was not improving. She was advised that the antibiotics took 48 hours to be effective. Mrs. Boey stopped giving the antibiotics to her son on October 26, 1981, because he was throwing them up. On October 27, 1981, Mrs. Boey again telephoned defendant and told him that her son was experiencing diarrhea, fever, and neck pulling. Dr. Quaas prescribed Donnagel PG and Pedialyte. Mrs. Boey took her son to Dr. Quaas' office on October 29, 1981. Dr. Quaas' notes in Jaron's medical records indicate that Mrs. Boey stated her son's condition had improved, but Mrs. Boey denied that she told Dr. Quaas that her son's condition had improved. She further stated she complained about the child's rigid neck.

Dr. Quaas testified that he examined Jaron's neck on October 29, 1981, but did not note any abnormalities at that time. He further stated that if he had found any stiffness in Jaron's neck, he would not have ignored the symptoms. His temperature was taken during the office visit, and it was 37.5 degrees centigrade. (On previous "well baby" examinations, Jaron's temperature had ranged between 37 degrees centigrade and 37.6 degrees centigrade.)

Testimony indicated Jaron's condition worsened on October 31, 1981; he was noticeably ill, had an elevated temperature, and his neck stiffness was constant rather than intermittent. Mr. Boey arranged for an appointment with Dr. Pothen Jacob. Dr. Jacob examined Jaron in his office on October 31, 1981, and hospitalized him in St. Mary's Hospital. His initial diagnosis was bacterial meningitis. The child was admitted to the hospital that same day, and a spinal tap was performed. This procedure confirmed Dr. Jacob's diagnosis. The spinal fluid was cloudy and contained 490 white blood cells. Dr. Jacob immediately began treating Jaron with the oral and intravenous administration of ampicillin. The ampicillin was ineffective. On November 2, 1981, chloramphenicol was added to Jaron's antibiotic therapy, and it caused a temporary improvement in his condition.

However, Jaron's condition did worsen. During his hospitalization Jaron was given fluids by mouth and intravenously. (Testimony indicated the restriction of fluid intake is essential in the treatment of bacterial meningitis because too much fluid in the body causes an increase in fluid pressure on the brain, which can cause brain damage and seizures.) During the first 24 hours, Jaron received a total of 1,570 cc of fluid, and received 1,200 cc during the next 24 hours. During the third 24-hour period, Jaron received 1,750 cc of fluid. There was testimony that the recommended amount of fluid intake in bacterial meningitis is 400 to 1,000 cc each day. Also, no tests were performed to determine if Jaron was experiencing an inappropriate secretion of antidiuretic hormone. Testimony indicated that bacterial meningitis can cause the inappropriate secretion of antidiuretic hormone, which increases the fluid pressure on the brain.

On November 4, 1981, Jaron suffered seizures and was transferred to Cardinal Glennon Memorial Hospital for Children in St. Louis, Missouri. Subsequent evaluation confirmed that the child suffered brain damage.

Several expert medical witnesses were called by the parties to testify at trial:

Plaintiff called Dr. Pothen Jacob as a witness. Dr. Jacob testified that he saw the child on October 31, 1981. He stated that at that time

Mr. Boey gave him a history indicating, among other things, that the child had a fever and loose stool for a period of two weeks and had pain in his neck for one week. In response to a hypothetical question setting forth the important facts in the instant case, Dr. Jacob stated that a delay in the diagnosis of bacterial meningitis can cause a delay in appropriate treatment and in turn result in neurological damage. Dr. Jacob testified that he believed there had been a deviation from community standards in Dr. Quaas' treatment of Jaron and stated that in his opinion a spinal tap should have been ordered on October 29, 1981. However, he admitted that he has only treated approximately 10 cases of bacterial meningitis and does not consider himself to be an expert in the diagnosis and treatment of the disease. He further stated that he failed to begin the administration of chloramphenicol on October 31, 1981, that he did not do so until November 2, 1981, and that this delay could have caused Jaron's brain damage. Dr. Jacob also testified about the amount of fluid Jaron received. He admitted that he did not restrict Jaron's intake of fluids and admitted that if Jaron were receiving up to four times the amount of recommended fluids, the excessive fluid was a likely cause of his brain damage and seizure. Dr. Jacob further stated that he failed to monitor Jaron Boey for the inappropriate secretion of antidiuretic hormone.

Dr. Arnold Soslow was called as a witness by plaintiff. Dr. Soslow is a physician who practices in the emergency room of Worchester Memorial Hospital in Worchester, Massachusetts. He stated that he has seen approximately 18 to 20 cases of bacterial meningitis in his career. In Dr. Soslow's opinion, the child had early signs of bacterial meningitis on October 29, 1981, the date on which Dr. Quaas examined the child. He testified that Dr. Quaas deviated from community standards and should have immediately accomplished a lumbar puncture. He further stated that Dr. Quaas' failure to perform the lumbar puncture led to the serious adverse effects. However, on cross-examination, Dr. Soslow admitted that, based on Dr. Quaas' office records for the October 29, 1981, examination of Jaron, he could not find any fault.

Dr. Granoff was called as a witness by defendant. Dr. Granoff is director of pediatrics and infectious disease at St.. Louis Children's Hospital in St. Louis, Missouri, and is a member of the faculty of Washington University School of Medicine. He stated he is board certified in pediatrics and further specializes in the diagnosis and treatment of infectious diseases. He has conducted research and has published approximately 50 articles concerning the organism that caused Jaron Boey's bacterial meningitis, hemophilus influenae. Dr. Granoff

stated he has treated more than 500 cases of bacterial meningitis in his career. He testified that defendant's care of Jaron met all accepted standards of medical care. He further stated that in his opinion Jaron was not suffering from bacterial meningitis on October 29, 1981. He said that Dr. Quaas' records indicated that Jaron's condition had improved, and Dr. Granoff testified that the condition of a person afflicted with bacterial meningitis does not improve in the absence of treatment but continues to rapidly deteriorate. Dr. Granoff further stated that Jaron was not exhibiting any symptoms of bacterial meningitis on October 29, 1981. Jaron did not have an abnormally elevated temperature, and almost all children suffering from bacterial meningitis experience an elevated temperature. Dr. Quaas' records show that there was no neck stiffness at that time. Dr. Granoff elaborated that bacterial meningitis does not produce intermittent neck stiffness. Finally, he stated the results of the spinal tap indicated that Jaron developed bacterial meningitis after October 29, 1981. It was Dr. Granoff's opinion that if the disease had developed before October 29, 1981, the number of white blood cells in the spinal fluid would have been much higher.

■■ ■ Plaintiff first contends that the verdict was against the manifest weight of the evidence. In determining whether a jury's verdict is against the manifest weight of the evidence, the inquiry on appeal is whether the result reached is reasonable on the facts and evidence, not whether other conclusions are possible. (*Nunley v. Village of Cahokia* (1983), 115 Ill. App. 3d 208, 214, 450 N.E.2d 363, 367.) In a malpractice case, the plaintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must further prove by affirmative evidence that, judged in light of these standards, the doctor was unskilled or negligent and that his want of skill or care caused the injury to the plaintiff. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05.

■■ We find that there was sufficient evidence to support the jury's verdict. Dr. Granoff testified that Dr. Quaas' care of Jaron Boey met all accepted medical standards and that he did not believe Jaron was suffering from bacterial meningitis on October 29, 1981. Evidence was introduced that showed on October 29, 1981, Jaron did not have an abnormally high temperature, like almost all children who have bacterial meningitis. Furthermore, Jaron was experiencing diarrhea, which is not a symptom of bacterial meningitis. Dr. Granoff also testified that bacterial meningitis produces noticeable neck stiffness that persists until the patient is effectively treated or dies, and Dr.

Quaas' records indicate that no neck stiffness was noted on October 29, 1981.

Dr. Ullah testified that when he examined Jaron in the emergency room of St. Mary's Hospital on October 21, 1981, Jaron's neck was supple.

Dr. Soslow testified that, based on Dr. Quaas' own records of Jaron, defendant's care met accepted medical standards.

Testimony at trial indicated that bacterial meningitis is an extremely acute disease that occurs suddenly and progresses until it is treated or the patient dies. Four hundred and ninety white blood cells were found in the spinal fluid taken during the spinal tap. Dr. Granoff voiced his opinion that a spinal tap on October 29, 1981, would have produced negative results because Jaron's bacterial meningitis developed after that date. There was also testimony that bacterial meningitis is sometimes preceded by a minor infection.

Additionally, there was evidence presented at trial that indicated Jaron's injuries could have been caused by inappropriate treatment by Dr. Jacob. Dr. Jacob delayed the administration of chloramphenicol, permitted the consumption of excessive fluids, and failed to monitor Jaron Boey for the inappropriate secretion of antidiuretic hormone. Furthermore, counsel for plaintiff stipulated, in the presence of the jury, that Dr. Jacob's mismanagement of Jaron Boey's fluid was a cause of the injuries.

Plaintiff contends that Dr. Quaas' own testimony indicated he was not complying with community standards. Dr. Quaas testified that his receptionist decides whether to use an "acute care" rubber stamp on his records based upon the condition of the child or a "well baby" rubber stamp. The records that were admitted into evidence showed the receptionist had used the "acute care" stamp on Jaron's visit on October 29, 1981. They thus argue that Jaron's condition had not "improved."

Dr. Quaas further admitted that he did not keep emergency room records when he did not personally see the child in the emergency room, that he did not keep the record of Jaron's October 21, 1981, visit to the emergency room, and that the shot of ampicillin that Jaron received on October 21, 1981, was not in his records. He also stated that prior to October 29, 1981, he had worked in excess of 100 hours per week and that it was possible that he was not as alert as he could have been. Dr. Quaas also admitted that until the litigation, he did not recall any conversation with emergency room people and had no recollection of prescribing Donnagel for Jaron's diarrhea. Dr. Quaas stated that he was mistaken about not having any contact with

the parents on October 27, 1981, and that there may have been a mistake in his records as to when Jaron's diarrhea started in view of the fact that he had admitted that he had prescribed the Donnagel two days earlier.

■ Even considering Dr. Quaas' testimony regarding his mistakes, it is the jury alone who must determine the weight of the evidence and credibility of the witnesses on controverted questions of fact. (*Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 441, 354 N.E.2d 415, 420.) A court of review will not set aside a jury verdict on the ground it is contrary to the manifest weight of the evidence unless it is indisputable that the jury reached the wrong conclusion. *Rowlett v. Hamann* (1969), 112 Ill. App. 2d 121, 126, 251 N.E.2d 358, 360.

We note that the jury's verdict in favor of Dr. Quaas is supported by substantial testimony from defendant's expert Dr. Granoff. Plaintiff's suggestion that Dr. Granoff's opinions were based on defendant's incomplete records does not reflect Dr. Granoff's testimony that his opinions were based on all materials he reviewed, including hospital records from St. Mary's Hospital and Cardinal Glennon Memorial Hospital for Children, and the depositions. Because we do not find the verdict contrary to the manifest weight of the evidence, we affirm.

■ We note that plaintiff claims that Dr. Quaas was negligent in not interjecting himself into Dr. Jacob's care of Jaron at St. Mary's Hospital. However, we find that this argument was expressly waived by plaintiff's counsel at trial and should not be considered on appeal. See *Graves v. North Shore Gas Co.* (1981), 98 Ill. App. 3d 964, 969, 424 N.E.2d 1279, 1284.

Plaintiff's last contention is that Dr. Quaas' counsel engaged in prejudicial conduct in commenting before the jury about plaintiff's settlement with Dr. Jacob.

■ It is well established that the interest, motive, and bias of a witness are always relevant considerations for a jury. The latitude permitted on cross-examination to establish bias, however, is within the trial court's discretion. (*People v. Nowak* (1979), 76 Ill. App. 3d 472, 477, 395 N.E.2d 28, 31.) Questions concerning the former litigant status of a witness came within the sound discretion of the trial court. *Schmitt v. Chicago Transit Authority* (1962), 34 Ill. App. 2d 67, 74, 179 N.E.2d 838, 841.

■ The complained of testimony occurred during cross-examination of Dr. Jacob by defendant's attorney. Dr. Jacob was asked the date of his settlement with plaintiff and if at the time of the settlement Mr. Freeark, Dr. Jacob's attorney, indicated that Dr. Jacob

would have to testify in this case. Dr. Jacob answered negatively. Dr. Quaas' counsel then inquired whether his attorney mentioned testifying in this case later, and Dr. Jacob answered affirmatively. Dr. Jacob stated that Mr. Freeark's office called and said he would be subpoenaed. An objection was made when defendant's counsel asked Dr. Jacob, "That was part of the settlement agreement, wasn't it?" Plaintiff's counsel objected by stating, "I am going to object to that. That is totally not true."

We must note that we are unable to find a case directly on point. However, "there is a general rule that in a civil action, the plaintiff may not prove that the defendant has settled any other claims arising from the same accident. The justification for the rule is that the admission of such evidence would discourage desirable, out-of-court settlements. Suppose though that the defendant calls a witness who has settled his or her claim with the defendant. The fact of the settlement is logically relevant and admissible to show the witness' bias in the defendant's favor." (Imwinkelried, Evidentiary Foundations sec. 4—H, at 42 (1980).) Conversely, the same must be true when a plaintiff calls as a witness a defendant who has settled the claim with the plaintiff and is dismissed from the action. The jury had a right to know whether Dr. Jacob agreed to testify against defendant as part of his settlement agreement with plaintiff so that it could accurately assess the credibility of his criticism. *Cf. Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 311, 379 N.E.2d 306, 315.

In any event, even if the questioning were improper, the question of whether conduct is or is not prejudicial rests within the sound discretion of the trial court, and its decision will not be disturbed unless it is clear that the court has abused its discretion. (*Martin v. Kralis Poultry Co.* (1973), 12 Ill. App. 3d 453, 464, 297 N.E.2d 610, 618.) It does not appear from the record of this trial that the trial court abused its discretion.

Thus, for the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KARNS and HARRISON, JJ., concur.