NO. 5-98-0690

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

MARC REARDON, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Effingham County.  

)

v. ) No. 95-L-55

)

BONUTTI ORTHOPAEDIC SERVICES, )

LTD., and TIMOTHY GRAY, M.D., ) Honorable

) John P. Coady, 

Defendants-Appellees.   ) Judge, presiding.  

___________________________________________________________________________

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Marc Reardon (plaintiff) appeals the February 27, 1998, judgment entered by the Effingham County circuit court.  The trial court entered the judgment following a jury verdict against plaintiff and for Bonutti Orthopaedic Services, Ltd., and Timothy Gray, M.D.  On appeal, plaintiff claims that the trial court erred in refusing to grant plaintiff a new trial where the jury’s verdict was contrary to the manifest weight of the evidence.  For the reasons that follow, the judgment is vacated and the cause is remanded for a new trial.

On July 26, 1995, plaintiff filed a four-count complaint against Bonutti Orthopaedic Services, Ltd., St. Anthony’s Memorial Hospital in Effingham (St. Anthony's), Peter Bonutti, M.D., and Timothy Gray, M.D. (defendant).  St. Anthony’s filed an answer on August 21, 1995, and the remaining defendants filed their answers on September 22, 1995.  On November 12, 1996, plaintiff filed a voluntary motion to dismiss the claim against Dr. Bonutti, and the trial court granted the motion on December 6, 1996.  Plaintiff filed an amended four-count complaint.  Drs. Bonutti and Gray and Bonutti Orthopaedic Services filed their answers on January 2, 1997, and St. Anthony’s filed its answer on January 9, 1997.  On April 11, 1997, St. Anthony’s filed a motion for summary judgment as to counts II and III.  Plaintiff responded by filing a motion to voluntarily dismiss, without prejudice, counts II and III on May 1, 1997, which the trial court granted.  On February 24 through 26, 1998, a trial was held against Dr. Gray and Bonutti Orthopaedic Services, Ltd.  The jury returned a verdict in favor of those defendants and against plaintiff.  The trial court entered the judgment on February 27, 1998.  After the trial, plaintiff obtained new counsel, and on March 27, 1998, the trial court granted plaintiff an extension of time to file his posttrial motion so his new counsel could review the proceedings.  On May 18, 1998, the parties agreed to grant plaintiff an additional two-week extension to file his posttrial motion.  An extension was again granted on May 29, 1998, until June 30, 1998, because plaintiff made a motion to interview the jurors.  On July 1, 1998, the trial court granted plaintiff’s motion to interview the jurors and gave an additional 30-day extension.  On July 30, 1998, the trial court granted one last extension to plaintiff until August 6, 1998.  Plaintiff filed his posttrial motion on August 6, 1998, requesting a judgment notwithstanding the verdict, or in the alternative, to grant a new trial because the jury verdict was against the manifest weight of the evidence.  The defendants responded on August 24, 1998.  A hearing was held on October 2, 1998, and the trial court denied plaintiff’s posttrial motion on the same day.  Plaintiff filed a timely notice of appeal. 

I.  FACTS

On January 10, 1995, plaintiff suffered multiple fractures to his right foot.  Plaintiff’s most severe fracture was of the calcaneus (heel) bone.  The fracture was described by all the physicians and nurses who examined plaintiff as highly comminuted, or broken into multiple pieces.  The calcaneus does not break along lines as other bones; rather, it shatters when suffering a trauma.  In this case, the heel bone was shattered and smashed up into the foot.  Testimony from all parties indicated that even if the doctors could fuse the pieces back together, plaintiff would suffer stiffness and a lack of ability to engage in high-intensity activities at the level that he had before the trauma.

At the trial, plaintiff called the nurses who attended to him at St. Anthony’s.  The two nurses whose testimony was of note were Deborah Niemerg and Julie Werner.  Nurse Niemerg worked the 7 a.m.-to-3 p.m. shift on January 12, 1995, and attended to plaintiff.  She stated that on January 12, 1995, plaintiff's 
toes were swollen but that they did blanch well.  (Blanching occurs when one applies pressure to the skin and the skin whitens and upon the release of the pressure, the skin returns to its normal color.  How swiftly the skin responds to this indicates the level of circulation in that part of the body.)  Nurse Niemerg believed that plaintiff could wiggle his toes on January 12, 1995.

Nurse Niemerg worked the 7 a.m.-to-3 p.m. shift on January 13, 1995, also.  Her nursing notes were not in the chart obtained from St. Anthony’s, so her testimony as to the events on January 13, 1995, was from her independent recollection.  She testified that plaintiff’s morphine intake during her shift on January 13, 1995, was 
nearly double his intake on January 12, 1995.  (Plaintiff controlled his own narcotic painkiller intake because of the pain associated with such a severely comminuted calcaneus.)  She stated that plaintiff's foot still blanched but that she did not believe the response was as good as on January 12, 1995.  
Plaintiff developed blisters on the top, sides, and bottom of his foot.  Nurse Werner relieved Nurse Niemerg at 3:30 p.m.  Nurse Niemerg communicated her concerns to Nurse Werner.  She then called defendant’s office sometime between 3:30 p.m. and 3:45 p.m. and talked to office personnel.  Nurse Niemerg saw defendant one time on the 
morning of January 13, 1995.  She testified that she listed plaintiff’s pain as a five on a scale of one to ten.  She noted that she became more and more concerned about plaintiff’s condition as her shift progressed on January 13, 1995, 
because the foot was turning a deeper purple color and the blanching was not as responsive.

Nurse Werner worked the 3 p.m.-to-11 p.m. shift on January 13, 1995.  As with Nurse Niemerg’s notes, Nurse Werner’s notes disappeared from St. Anthony’s chart, and she testified from her independent recollection.  Upon relieving Nurse Niemerg, Nurse Werner received a report on plaintiff’s condition, and the two went in to examine plaintiff’s foot together.  There was now a whitish-gray patch of skin on the top of plaintiff’s foot.  After her examination, Nurse Werner asked Nurse Niemerg to call and inform defendant of plaintiff's condition.  Nurse Niemerg informed Nurse Werner that she had been told that defendant would see plaintiff the following morning.  Nurse Werner continued to monitor plaintiff because his circulation worsened.

At 5:10 p.m. on January 13, 1995, Nurse Werner called defendant and personally informed him of the poor blanching of plaintiff's toes, the poor circulation, and the whitish-

gray patch on his foot.  Defendant told her to keep plaintiff's foot elevated and iced and that he would see plaintiff in the morning.  Nurse Werner claims that she called defendant three more times before she and Nurse Mix, another nurse on duty, called defendant at 6:20 p.m.  Defendant denies receiving five calls from the nurses between 5:10 p.m. and 6:20 p.m. on January 13, 1995, 
and only acknowledges two phone calls.  During the 6:20 p.m. call, Nurse Werner asked defendant to come and examine plaintiff in person after Nurse Mix, a registered nurse on another floor that had at least seen plaintiff’s foot beginning on the morning on January 13, 1995, told defendant about the perceived change in the condition of plaintiff’s foot.

At this point, defendant requested a Doppler study, a test that checks the circulation of the arteries and veins, and he also requested that Dr. Inder Khokha, a vascular surgeon, see plaintiff.  Nurse Werner informed defendant that the Doppler technician was not present at the hospital and that Dr. Khokha was in his car en route to Chicago.  Defendant then requested that plaintiff be transferred to a hospital with a vascular surgeon; however, before the transfer order went through, a technician arrived, and the Doppler study was conducted.  Defendant asked for the technician to call him when the results of the Doppler study were known.  On cross-examination Nurse Werner stated that she listed plaintiff’s pain as a six on a one-to-ten scale and that plaintiff could move his toes.  On redirect examination, Nurse Werner stated that plaintiff could wiggle his toes; however, she stated that he did not want to do so because the pain was too intense.

Dr. Khokha was contacted by a nurse at 6:42 p.m. on January 13, 1995, at the request of defendant regarding his seeing plaintiff.  Dr. Khokha informed the nurse that he was unavailable because he was en route to Chicago.  Later, defendant contacted Dr. Khokha and discussed plaintiff’s poor circulation.  Dr. Khokha agreed with defendant’s decision to conduct vascular tests and to transfer plaintiff to a hospital with a vascular surgeon.  After having the lab technician discuss the results of the tests conducted on plaintiff's foot, Dr. Khokha explained the circulation of the foot.  The foot has two main arteries, doralis pedis and tibial posterior.  These main arteries branch out into digital arteries and then to capillaries that deliver oxygen to the muscle cells.  Dr. Khokha testified that the results of the test demonstrated that plaintiff had adequate profusion (blood flow) at the ankle but that the profusion was poor at the toes.  Therefore, Dr. Khokha surmised that plaintiff’s problem was at the digital artery or capillary level between the ankle and the toes.  Dr. Khokha opined that defendant took the appropriate step of transferring plaintiff to a facility with a vascular surgeon.  At approximately 9 p.m. on January 13, 1995, 
plaintiff was transferred from St. Anthony’s to St. John's Hospital in Springfield (St. John's).

The first physician to see plaintiff at St. John’s was Dr. Ashraf Mansour, a vascular surgeon.  Dr. Mansour received a history from plaintiff and conducted a physical examination of plaintiff’s foot.  Dr. Mansour stated that plaintiff’s ankle was receiving circulation but that his toes were not.  He ordered a Doppler study, which confirmed his assessment that plaintiff had good circulation at the ankle level but no circulation at the toes.  Dr. Mansour testified that at this time his impression was that plaintiff was suffering from compartment syndrome.  Compartment syndrome is an increase in pressure within the compartments in which muscles are contained.  Muscles are surrounded by tissue that keeps them in compartments, and when the pressure inside these compartments increases to a certain level, the expansion begins to pinch the arteries.  When the pressure is great enough, the arteries can close, causing blood flow to stop.  Eventually, if not relieved, compartment syndrome leads to muscle necrosis or death.

Because Dr. Mansour opined that the compartment syndrome was a result of a shattered calcaneus, he believed that an orthopaedic physician would be better able to treat the compartment syndrome, and he contacted Dr. Timothy Lang, a resident orthopaedic surgeon at St. John’s.  Dr. Lang agreed with Dr. Mansour’s diagnosis.  They decided to contact Dr. John Fisk, resident supervisor and orthopaedic surgeon at St. John’s.  Dr. Mansour conceded on cross-examination that no compartment pressures were taken.  (All the physicians in this case testified as to an instrument that can definitively inform the physicians if there is increased pressure in a compartment.)  However, Dr. Mansour stated that when a patient suffers from the clear clinical signs of compartment syndrome, the device is not necessary.  The clinical signs entail the "five Ps."  Physicians check for: (1) pain out of proportion, (2) pulselessness, (3) pallor, (4) parathesia, and (5) pain with passive movement.  Dr. Mansour’s notes indicated that he did not detect arterial damage upon his physical exam.  Also, he noted that the blood flow in the foot was decreased, not absent.  Although his notes indicated that plaintiff could not move his great toe, his personal recollection was that plaintiff could not move any of his toes.  At 12:10 a.m. on January 14, 1995, Dr. Mansour wrote his notes but did not recommend procedures for surgery, such as that no food be taken.  Dr. Mansour admitted that these orders were inconsistent with a recommendation of fasciotomy, the surgical procedure to relieve the compartment pressures, but that the diagnosis was a working one and subject to modifications upon consultation with an orthopaedic surgeon.  Dr. Mansour testified that plaintiff suffered from compartment syndrome and that the proper procedure was a fasciotomy.

Dr. Lang was paged by Dr. Mansour shortly after midnight on January 14, 1995.
  Dr. Mansour talked to Dr. Lang over the phone and told him that plaintiff needed an orthopaedic evaluation and that he suspected a compartment syndrome that might require surgery.  Dr. Lang examined plaintiff’s x rays and noted that plaintiff had a severe calcaneus fracture.  He took plaintiff's history, during which plaintiff informed him that he was worried about his foot because he suffered increased pain during the morning of January 13, 1995.  
Dr. Lang’s examination revealed swelling, hemorrhagic fracture blisters, and branching necrosis of the skin on the top of the foot.  Dr. Lang noted that the bottom surface of plaintiff's foot was swollen and that a palpation of the calcaneus and an extension of the toes caused plaintiff severe pain.  
Dr. Lang believed that plaintiff was able to actively (by himself) move his toes by using the muscles in his calf and not those in his foot.  Dr. Lang also stated that when he passively moved plaintiff’s toes, plaintiff had significant pain.  He testified that he conducted his examination of plaintiff from 12:15 a.m. to 12:25 a.m. but that the time reflected in his notes was 1:10 a.m.  Dr. Lang explained that the time on the notes is later, as he does not write his notes until after the examination.

After his examination of plaintiff, Dr. Lang contacted Dr. Fisk to discuss the case.  Dr. Lang relayed the results of the physical exam and stated his diagnosis of compartment syndrome.  He told Dr. Fisk that the diagnosis was from the physical evaluation.  Dr. Fisk agreed with Dr. Lang's diagnosis, and he agreed that surgery was needed to relieve the pressure.  Dr. Fisk believed that plaintiff’s foot would benefit from increased oxygen immediately after surgery, and he recommended that plaintiff be put in a hyperbaric oxygen chamber.  St. John’s did not have such a facility, and so Dr. Fisk recommended that plaintiff be transferred to Memorial Medical Center (Memorial), also in Springfield, which possesses a hyperbaric chamber.  After talking with Dr. Fisk, Dr. Lang contacted Dr. Konrad, who is involved with hyperbaric oxygen at Memorial, Dr. Crickard, an orthopaedic resident on call at Memorial, and Dr. Chris Wottowa, chief resident on call at Memorial.

Dr. Lang testified that he was confident of his clinical diagnosis and that time was of the essence.  He stated that measuring the compartment pressures would definitively define a diagnosis of compartment syndrome but that the device was on another floor.  On cross-

examination, the defense questioned Dr. Lang as to why he had time to transfer plaintiff but did not have time to check plaintiff's compartment pressures.  Dr. Lang explained that the time it takes to prepare an operating room at either hospital is the same and that a transfer by an ambulance would not affect the swiftness with which a patient and facility could be ready for surgery.

Dr. Lang opined that defendant deviated from the standard of care due plaintiff by failing to personally examine plaintiff after being contacted by the nurses from St. Anthony’s on the evening of January 13, 1995.  
Dr. Lang did concede that arterial or vascular trauma could eventually develop into compartment syndrome but stated that he did not believe that to be the case here.  He testified that the fact that plaintiff had circulation to his toes immediately following the initial trauma on January 10, 1995, 
indicates that blood flow was compromised only after the compartment syndrome worsened and not vice-versa.  Dr. Lang testified that from the onset of compartment syndrome, a patient has a six- to eight-hour window for a realistic chance of saving the muscles.  In this case, that window had passed by the time surgery was performed.  From a review of St. Anthony's records, as well as  the testimony of the nurses at St. Anthony’s, Dr. Lang opined that only defendant, as plaintiff’s physician during the crucial time period, could have diagnosed the compartment syndrome and saved the muscles in plaintiff’s foot.  Therefore, defendant deviated from the standard of care owed to plaintiff.

Dr. Fisk first saw plaintiff in the operating room at Memorial, where Dr. Wottowa and Dr. Crickard were present to assist in the procedure.  Multiple incisions were made on the compartments in plaintiff’s foot.  Dr. Fisk testified that upon incising the compartments, the muscles bulged out and appeared grayish-red in color.  He testified that no bleeding occurred upon the incision.  He stated that all of these are signs of muscle death.  Dr. Fisk applied an electronic stimulant to the muscles with no success.  The muscles were in fact dead.  Dr. Fisk testified that the lack of bleeding indicated that the artery had thrombosed or clotted.  He continued to state that the artery had, in his medical opinion, clotted because of compartment syndrome.

Dr. Fisk testified that the clinical signs before surgery indicated compartment syndrome and that, upon operating on the foot, he made the diagnosis of compartment syndrome.  He stated that the bulging of the muscle out of the compartment after cutting the tissue is indicative of the pressure that existed in the compartments of the foot and, therefore, indicated that plaintiff’s foot suffered from compartment syndrome.  He continued to explain that compartment syndrome is a condition whose seriousness is determined by time.  If compartment syndrome is diagnosed and the pressure is relieved, via a fasciotomy, the condition can be reversed.  In this case, Dr. Fisk opined that plaintiff developed the condition during the afternoon of January 13, 1995.  
He bases this upon the time it takes from the onset of compartment syndrome until muscle death (six to eight hours), as well as the testimony of the nurses at St. Anthony’s and the records from St. Anthony’s.

The defense questioned Dr. Fisk as to how he could definitively know that plaintiff’s foot did not have arterial damage that slowly clotted the arteries of the foot and developed into compartment syndrome.  Dr. Fisk refuted this thinking based upon the records from St. Anthony’s.  While conceding that vascular damage may coexist and even cause compartment syndrome, he stated that the records indicate that plaintiff had adequate circulation to his toes immediately following the initial trauma.  Only over a period of days did circulation to plaintiff’s toes show signs of decreasing.  In fact, Dr. Fisk notes that plaintiff could move his toes when leaving St. Anthony’s, could not move his great toe when Dr. Mansour examined him upon arriving at St. John’s, and could not move any toes before surgery at Memorial.  Dr. Fisk opined that this demonstrates that the pressures were increasing in the foot compartments and slowly cutting off circulation.  Dr. Fisk also conceded that the dead skin on the top of plaintiff’s foot is usually indicative of vascular injuries but that when compartment syndrome advances to a certain point, this can occur because the pressure has cut off all circulation.

Dr. Fisk opined that defendant deviated from the standard of care owed to plaintiff by failing to personally examine plaintiff on the evening of January 13, 1995.  
Dr. Fisk believes that the reports that the nurses were giving defendant should have alerted him that something was happening and that a physical examination by a physician was necessary.  Dr. Fisk did not have a problem with anything else that defendant did or did not do.  He agreed that consulting a vascular surgeon was appropriate and the prudent thing to do.  However, Dr. Fisk opined that the failure to personally examine plaintiff’s foot on the evening of January 13, 1995, 
resulted in lost time and caused plaintiff to lose his right foot.

Dr. Wottowa was one of the orthopedic resident surgeons who operated on plaintiff’s foot.  Dr. Wottowa physically examined plaintiff before surgery at Memorial.  Based upon his examination and the history of the plaintiff’s condition, Dr. Wottowa testified that he believed that plaintiff suffered from compartment syndrome of the right foot.  He testified that this diagnosis was confirmed by the condition of the foot he observed during surgery.  He opined that pain is the best clinical sign of compartment syndrome, although it can be somewhat controlled with narcotics.  He opined that compartment syndrome could have been diagnosed between 8 a.m. and 6:30 p.m. on January 13, 1995.  
He stated that the condition of the muscles during surgery indicated that plaintiff had suffered from compartment syndrome for more than eight hours.  He also testified that the thrombosis of the tibial artery was caused by the compartment syndrome.

Plaintiff’s expert witness was Dr. Michael Grear.  Dr. Grear reviewed all the records and depositions in this case and arrived at the medical opinion that defendant deviated from the appropriate standard of care owed to plaintiff.  Dr. Grear testified that plaintiff clearly suffered from compartment syndrome.  He stated that the condition began around 2 p.m. or 3 p.m. on January 13, 1995.  
He denoted this time because he expected that the amount of morphine taken by plaintiff to control his pain would have subsided by this point.  He stated that the pain associated with a calcaneus fracture should begin to dissipate in a couple of days; however, in this case the pain medication taken by plaintiff increased over time.  He stated that plaintiff's condition, at the very least, showed clinical signs of compartment syndrome and that if defendant had doubts as to whether plaintiff had compartment syndrome, he could have measured the compartment pressures and verified the condition one way or the other.  Dr. Grear testified that he had no problem with defendant ordering a vascular study in evening of January 13, 1995, 
following the nurses’ phone calls as to the condition of plaintiff’s foot.  However, he testified that defendant deviated from the standard of care by neglecting to personally examine plaintiff that evening.  Dr. Grear stated that if defendant had visited and properly diagnosed plaintiff with compartment syndrome, then the chances of saving plaintiff’s foot would have been considerably higher, because the determinant of whether compartment syndrome results in muscle death is the swiftness with which a physician can relieve the pressure in the compartments.

Next, defendant was called as an adverse witness.  Defendant admitted that he assumed the care for plaintiff when Dr. Bonutti left on the evening of January 12, 1995.  
He stated that he saw plaintiff’s foot on January 11, 1995,
 and saw plaintiff on his rounds at 8 a.m. on January 13, 1995, 
and that plaintiff’s foot was the same as when he saw it on January 11, 1995.  
He also visited plaintiff at noon on January 13, 1995, but 
did not examine his foot.  Defendant testified differently as to the number of phone calls received by the nurses between 5 p.m. and 6:30 p.m. on January 13, 1995, 
but does not deny that two calls occurred or that the nurses were concerned and asked for him to come see plaintiff’s foot.  Defendant states that he was most concerned with the change of the color of the skin on the top of the foot, which indicates a vascular problem.  The time line of events is the same from here on as the other witnesses testified to; however, defendant disagrees with plaintiff’s experts' medical opinions as to the clinical signs.  He refutes that the pain was out of proportion, that plaintiff’s heel bone was shattered, and that large amounts of narcotics are not unusual to control the pain associated with such an injury.  He disagreed that pain with passive movement of the toes is the best clinical technique to diagnose compartment syndrome.  He believes, contrary to most other testimony, that active movement of the toes indicates that the muscles in the foot are not in trauma and compartment syndrome is not present.  The other experts stated that one must check for pain with passive movement (movement induced by someone else) because even if compartment syndrome exists, patients may still be able to wiggle their toes using the muscles in the calf.  Only passive movement guarantees that the muscles in the foot are being stretched, and if one is suffering from compartment syndrome, the amount of pain is enormous.  Defendant disagreed with his expert, Dr. Mark Myerson, that compartment syndrome is diagnosable only by using compartment pressure measurements.  He also stated that any testimony diagnosing plaintiff with compartment syndrome is wrong.

Defendant’s first expert was Dr. Robert Pierron, an orthopaedic surgeon and associate professor of orthopaedics at St. Louis University.  Dr. Pierron opined that plaintiff suffered an arterial or vascular injury.  He based this conclusion on a CT scan of plaintiff’s foot, which had been taken in the emergency room at St. Anthony’s.  He testified that the records did not indicate pain out of proportion with a calcaneus fracture on the level of severity as that suffered by plaintiff.  He testified that defendant did not deviate from the standard of care by not personally examining plaintiff on the evening of January 13, 1995.  
He stated that it is not inappropriate for a physician to rely on the physical examination conducted by a nurse and that a physical examination would not have resulted in a different report of the findings of the foot.  He testified that compartment syndrome probably did develop in plaintiff’s foot but was a result of the arterial injury suffered during the initial trauma.  When an arterial trauma causes circulation to decrease or even stop, the muscles do not receive sufficient oxygen and begin to die.  This death of muscle causes swelling, which can increase the pressure in a compartment and result in compartment syndrome.  Dr. Pierron testified that both passive and active movement may be helpful in clinically diagnosing compartment syndrome.  However, in this case, he believes that plaintiff suffered a vascular injury that may have resulted in compartment syndrome.  He stated that both can exist concurrently and that he had no criticism for any physician in the case.

The final expert to testify was Dr. Mark Myerson, a board-certified surgeon.  Dr. Myerson opined that plaintiff never suffered from compartment syndrome and that all the physicians who testified that he did were incorrect.  Dr. Myerson noted a "spike" of bone protruding into plaintiff’s neurovascular bundle of the right foot.  Dr. Myerson explained that the foot has a bundle consisting of nerves, arteries, and veins and that the severe fracture of the calcaneus bone caused a fragment of bone to jut into the bundle.  He further testified that the Doppler study conducted on January 13, 1995, 
illustrates that the tibial artery was not open.  He opined that the bone fragment in the neurovascular bundle either cut the artery or pinched it so that the blood flow to the muscles in the foot was decreased.  Either way, the problem was a vascular problem suffered from the initial trauma to the calcaneus bone.

Reliance on the "five Ps"–pain out of proportion, pallor, pulselessness, parathesia, and pain with passive motion–is useless according to Dr. Myerson.  While conceding that pain would be excruciating and while using the lack of pain as a basis for believing that plaintiff did not have compartment syndrome, Dr. Myerson testified that the only manner to diagnose a patient with compartment syndrome is by taking the compartment pressures.  Dr. Meyerson stated that even Dr. Fisk was wrong when he definitively stated that, based on his observations during surgery, plaintiff suffered from compartment syndrome.

Dr. Myerson testified that he believed that defendant followed the applicable standard of care in ordering vascular studies for plaintiff on January 13, 1995.  
He also agreed with defendant’s decision to transfer plaintiff to a hospital with a vascular surgeon.  He did not believe that defendant’s care for plaintiff contributed to the amputation of plaintiff’s right foot.  However, Dr. Myerson did criticize the sending of plaintiff to a vascular surgeon, because the injury was at a level of the circulatory system where a microvascular surgeon was required.

II.  ANALYSIS

Plaintiff contends that the jury verdict and the following judgment were against the manifest weight of the evidence.  Therefore, this court must determine whether the opposite conclusion is apparent or whether the judgment is arbitrary, unreasonable, or not based upon the evidence.  See 
Leonardi v. Loyola University
, 168 Ill. 2d 83, 106, 658 N.E.2d 450, 461 (1995); 
Wodziak v. Kash
, 278 Ill. App. 3d 901, 913, 663 N.E.2d 138, 147 (1996); 
Boey v. Quaas
, 139 Ill. App. 3d 1066, 1071, 487 N.E.2d 1222, 1224 (1986).  The proper inquiry is whether the result reached is reasonable based upon the facts and evidence, not whether other conclusions are possible.  See 
Boey
, 139 Ill. App. 3d at 1071, 487 N.E.2d at 1224.

In a medical malpractice case, the plaintiff bears the burden of proving: (1) the standard of care that the defendant physician owed to patients in the plaintiff’s position, (2) that the defendant physician violated that standard of care, and (3) that the defendant physician’s deviation was the proximate cause of the plaintiff’s injuries at issue in the suit.  See
 
Pumala v. Sipos
, 163 Ill. App. 3d 1093, 1098, 517 N.E.2d 295, 298 (1987); 
Boey
, 139 Ill. App. 3d at 1071-72, 487 N.E.2d at 1224-25.  The plaintiff must prove by a preponderance of the evidence that defendant was the proximate cause.  See 
Pumala
, 163 Ill. App. 3d at 1098, 517 N.E.2d at 298; 
Boey
, 139 Ill. App. 3d at 1071-72, 487 N.E.2d at 1224-25.  In this case, the central issue is whether plaintiff suffered from compartment syndrome that resulted in the amputation of plaintiff’s right foot, for which defendant would be liable for failing to diagnose, or a vascular problem, for which defendant would be liable for not diagnosing.

The evidence at the trial indicates that it was compartment syndrome.  Every physician, save two, testified within a reasonable degree of medical certainty that plaintiff suffered from compartment syndrome.  The two physicians who disagreed were defendant, whose motives must be questioned as self-serving, and Dr. Myerson, who stated that one cannot diagnose compartment syndrome unless one uses an instrument that actually measures the pressure inside the compartments.  Dr. Meyerson testified that plaintiff suffered from a microvascular injury; however, he never personally examined plaintiff, but rather he reviewed depositions and medical records in making his diagnosis.  On plaintiff’s side, every physician stated that plaintiff suffered from compartment syndrome.  Even Dr. Pierron, another of defendant’s experts, testified that he believed that plaintiff suffered an initial vascular injury, but that such an injury can lead to compartment syndrome.  The only saving grace for defendant was that if the compartment syndrome developed from a vascular injury, it could adjust the time frame so that defendant would not be held responsible.

All other physicians testified that plaintiff had compartment syndrome, including Dr. Fisk, who performed the fasciotomy on plaintiff in the hopes of relieving the compartment pressures before muscle necrosis set in.  Dr. Fisk testified that plaintiff suffered from compartment syndrome.  He based this diagnosis on the state of the muscles within the foot that he observed during surgery.  This diagnosis was supported by Dr. Mansour, who clinically diagnosed plaintiff with compartment syndrome, and Drs. Lang and Wottowa, who not only clinically diagnosed plaintiff with compartment syndrome but also observed the muscles during the fasciotomy.  Plaintiff also presented an expert, Dr. Grear, who, based upon a review of depositions and medical records, testified that he believed that plaintiff suffered from compartment syndrome.

Even with this evidence, the jury returned a verdict in favor of defendants.  The defense correctly asserts that assessing the weight and credibility of testimony is exclusively in the province of the jury.  See 
Wodziak
, 278 Ill. App. 3d at 913-14, 663 N.E.2d at 147.
  When conflicting testimony exists, it is for the jury to resolve the conflict.  See 
Wodziak
, 278 Ill. App. 3d at 913-14, 663 N.E.2d at 147.  
However, the jury cannot accept expert testimony arbitrarily.  The jury must consider the facts and the evidence upon which the experts base their opinions.  
In this case, all the physicians had access to the same records.  Defendant’s expert, Dr. Myerson, had less personal knowledge to base his opinion than Drs. Fisk, Lang, and Wottowa, who had the same records as Dr. Myerson and also personally examined plaintiff, as well as performed or assisted in the fasciotomy.  

The jury may have concluded that Dr. Pierron was correct, which would reconcile all the physician testimony.  If plaintiff suffered a vascular injury that developed into compartment syndrome, then the testimony of Dr. Lang and Dr. Myerson could be reconciled.  Dr. Lang encountered plaintiff after he developed compartment syndrome.  Dr. Myerson based his diagnosis on the initial trauma.  Thus, defendant could not have diagnosed compartment syndrome until after defendant properly transferred plaintiff to a hospital with a vascular surgeon.  However, plaintiff had good circulation immediately following the accident on January 10, 1995, 
and only developed decreased circulation on January 13, 1995.  
The evidence shows that plaintiff suffered from compartment syndrome that could have been diagnosed in the late afternoon or early evening on January 13, 1995.

Time is a key component in compartment syndrome.  From the onset, or the point where it is reasonable to diagnosis compartment syndrome, a patient has six to eight hours to have the pressure relieved, or the muscles will die.  Thus, if surgery was performed shortly after 2 a.m. on January 14, 1995, 
then 6 p.m. to 8 p.m. would have been the latest possible time, with mid- to late afternoon being better, to diagnose plaintiff with compartment syndrome and save the muscles in the foot.  During this period of time, plaintiff was under defendant’s watch, and the nurses at St. Anthony’s were informing defendant of a change in plaintiff’s condition.  It was a violation of defendant’s duty of care to fail to come to the hospital and physically examine a patient whose condition was changing, especially when nurses are requesting that defendant do so.

Plaintiff did not need to prove that if defendant had come to the hospital and examined plaintiff, that would have prevented plaintiff’s foot from being amputated.  The Illinois Supreme Court settled the question of whether to use the "loss of chance" doctrine or the "better result" test, in 
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997).  The supreme court held that it was not necessary for a plaintiff in a medical malpractice case to have to prove beyond that of a normal negligence case by being required to prove that a better result would have been achieved absent the alleged negligence of the doctor.  Rather, the plaintiff must prove, by a preponderance of the evidence, that the doctor's negligence costs him a chance for a better result.  See 
Holton
, 176 Ill. 2d 95, 679 N.E.2d 1202; 
Borowski v. Von Solbrig
, 60 Ill. 2d 418, 328 N.E.2d 301 (1975); 
Hajian v. Holy Family Hospital
, 273 Ill. App. 3d 932, 940, 652 N.E.2d 1132, 1136 (1995).  In this case, the negligent delay of defendant in failing to examine plaintiff on January 13, 1995, resulted in a decreased chance of saving the muscles in plaintiff’s foot.  Negligent delay or treatment that lessens the effectiveness of treatment is sufficient to prove proximate cause under the "loss of chance" doctrine.  
Hajian
, 273 Ill. App. 3d at 937, 652 N.E.2d at 1136-37; 
Chambers v. Rush-

Presbyterian-St. Luke’s Medical Center
, 155 Ill. App. 3d 458, 508 N.E.2d 426 (1987).

In this case, the weight of expert testimony would lead a reasonable person to the conclusion that plaintiff suffered from compartment syndrome at some point in time.  Plaintiff established the time period in which defendant was responsible for the care of plaintiff and that during that period of time defendant could have diagnosed plaintiff’s condition.  The evidence demonstrates that defendant did not personally come to the hospital to examine plaintiff, even after being requested to by plaintiff’s nurses.  Plaintiff has proven, at the very least, that the chances of saving his foot would have been greater had defendant physically examined his foot.  Therefore, we conclude that the jury's verdict was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Effingham County is vacated, and the cause is remanded for a new trial.

Vacated; cause remanded.

WELCH and CHAPMAN, JJ., concur.

NO. 5-98-0690

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

MARC REARDON, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Effingham County.  

)

v. ) No. 95-L-55

)

BONUTTI ORTHOPAEDIC SERVICES, )

LTD., and TIMOTHY GRAY, M.D., ) Honorable

) John P. Coady, 

Defendants-Appellees.   ) Judge, presiding.  

___________________________________________________________________________

Opinion Filed
: September 29, 2000

___________________________________________________________________________

Justices
: Honorable Richard P. Goldenhersh, P.J.

Honorable Thomas M. Welch, J., and

Honorable Charles W. Chapman, J.,

Concur

___________________________________________________________________________

Attorney
 M. Keith Smith, Law Offices of M. Keith Smith, 123 South 10th 

for
 Street, Suite 407, Mercantile Building, P. O. Box 745, Mt. Vernon,

Appellant
 IL 62864

___________________________________________________________________________

Attorney
 Richard C. Hayden, 201 East Richmond Avenue, P. O. Box 1216, 

for
 Mattoon, IL 61938

Appellees

___________________________________________________________________________