JOHN MATTHEWS *et al.*, Plaintiffs-Appellants, v. JANET AGANAD *et al.*, Defendants-Appellees.

First District (5th Division)    No. 1—08—0499

Opinion filed September 4, 2009.

---

Sal Indomenico, of Sal Indomenico & Associates, P.C., and Krista R. Frick and William J. Rogers, both of Bollinger, Ruberry & Garvey, both of Chicago, for appellants.

Robert Marc Chemers, Charles F. Redden, and Rena A. Ballard, all of Pretzel & Stouffer, Chtrd., of Chicago, for appellees.

JUSTICE TOOMIN delivered the opinion of the court:

In this medical malpractice action, we consider whether plaintiffs' reliance on the "lost chance" doctrine sufficed to establish a causal link between defendants' purported breach of duty and plaintiffs' subsequent harm. Plaintiffs brought claims for malpractice and loss of consortium against defendant doctors Janet Aganad and Donna Hanlon, and against Gottlieb Memorial Hospital for vicarious liability as Aganad's principal, for negligent care and treatment of plaintiff John Matthews. Plaintiffs alleged damages for the failure to timely administer a vaccine to Mr. Matthews, which resulted in endocarditis. The jury rendered a verdict in favor of defendants, and plaintiffs appeal, asserting that the verdict is against the manifest weight of the evidence. Plaintiffs seek vacature of the judgment and remand for entry of judgment notwithstanding the verdict or a new trial. For the following reasons, we affirm.

## BACKGROUND

In late December of 1999, Mr. Matthews became ill with severe chills, weakness, fever, fatigue and nausea. On January 1, 2000, he presented to the emergency room at Gottlieb Memorial Hospital with these symptoms, where, following a physical examination and blood workup, he was admitted for inpatient treatment. Defendant Dr. Janet Aganad was assigned as plaintiff's primary care physician during his admission. Dr. Aganad reviewed the emergency room lab results, which revealed that plaintiff's white blood cell count was 14,000, indicative

of an infection. Aganad ordered intravenous fluids, antibiotics, and pain medication.

On January 3, 2000, Aganad requested a consultation for plaintiff with an infectious disease specialist. Since plaintiff was also complaining of right upper quadrant pain, Aganad also requested a consultation with a surgeon, Dr. Sung Kim. After evaluation and further testing, Dr. Kim confirmed that plaintiff had a gallbladder condition. In turn, he underwent a cholecystectomy and had his gall bladder removed.

The infectious disease specialist, Dr. Donna Hanlon, saw plaintiff from January 3 through January 7. The blood cultures that were taken upon plaintiff's admission revealed that he had a streptococcal pneumonae infection for which antibiotics were prescribed. During one of Hanlon's examinations of plaintiff, Hanlon advised plaintiff that, although he did not fit any of the risk factors, he could consider getting the pneumococcal vaccine once he was over his current infection. However, plaintiff's current course of treatment was to remain on antibiotics, which he continued taking following his discharge from the hospital on January 8, 2000.

Plaintiff had two follow-up visits with Aganad on January 18 and February 4, 2000. On those occasions he complained of severe back pain, chills and sweating. The physical examination and tests on these two follow-up visits were not conclusive that the pneumococcal infection had fully resolved. Aganad also considered a possible infection or abscess in the metal plate placed in plaintiff's spine in a 1990 surgery. The consulting radiologist recommended an indium scan, which was performed on February 9, 2000. On February 11, 2000, Aganad received the radiology reports and contacted plaintiff and advised him that there were no abnormalities or infections. Aganad had no further contact with plaintiff.

In November 2001, plaintiff began seeing internist Dr. Peter Bell to manage his blood pressure. Plaintiff was treated by Dr. Bell and his partners for various issues until June 2002. Bell was informed at the time of plaintiff's initial visit of his earlier pneumococcal infection. However, plaintiff was not given the pneumococcal vaccine while under Bell's care because there was nothing in plaintiff's medical history that would have indicated that he had any risk factors. In June 2002, plaintiff was admitted to Mount Sinai Hospital under the care of Bell. Plaintiff was subsequently diagnosed with Streptococcus pneumoniae septicemia and aortic valve endocarditis, which required aortic valve replacement surgery in October 2002.

On November 21, 2003, plaintiffs filed the instant suit. Plaintiffs alleged that Aganad was negligent in failing to offer Pneumovax to

Mr. Matthews either during his admission to Gottlieb Memorial Hospital or during subsequent follow-up visits, because he was African-American and had already had the pneumococcal infection, and he was at increased risk for contracting it again. Plaintiffs alleged that the failure to administer Pneumovax resulted in the infection and related damages, including endocarditis, aortic valve replacement, a coronary artery bypass graft, and future medical care and risks. Plaintiffs alleged Hanlon was negligent in failing to advise Aganad, to offer Pneumovax to Mr. Matthews.

Aganad testified that the Center for Disease Control (CDC) and its advisory committee recommendations in its Morbidity and Mortality Weekly Report (MMWR) provide internists like herself with guidelines for the administration of the pneumococcal vaccine, and that these guidelines are the standard of care. In January 2000, as set forth by the published guidelines by the CDC MMWR, the indications for offering the pneumococcal vaccine included patients who were over 65 years or older, or had chronic illnesses, lacked a liver or suffered from alcoholism, cirrhosis, or cerebrospinal fluid leaks, those who belonged to certain native populations, or patients who were immunocompromised. Aganad relied upon these guidelines, and plaintiff initially had none of these indications. In addition, plaintiff's complaints and symptoms, both in the hospital and subsequent to his discharge, were not consistent with indications for administering the vaccine. The CDC guidelines do not include being African-American or having once had an infection as indications for giving the vaccine.

Additionally, as Dr. Aganad noted, the Physicians Desk Reference (PDR) cautions that the vaccine is not recommended for patients that are febrile or have an active infection. When admitted to the hospital, plaintiff was febrile and had an active infection. On plaintiff's January 18, 2000, follow-up, Aganad suspected an infection in his metal back plate due to his complaints of back pain, sweating and chills. As noted, on February 4, 2000, the radiologist advised that additional tests were necessary for the suspected infection. Thus, Aganad decided not to administer the vaccine to plaintiff. Aganad testified that even if plaintiff had fallen within the CDC guidelines, she still would not have administered the vaccine due to the suspected infection. Plaintiff continued being treated with antibiotics for an active infection after he was discharged on January 8, 2000.

Further, Aganad testified that under the standard of care, she can follow the recommendations of the consultant or she could make any decision she deems appropriate for the patient, as she is the primary care physician. Even assuming Hanlon had told Aganad that plaintiff was at increased risk of contracting the infection again, she still would

not have prescribed the vaccine to plaintiff, as she was unaware of an increased risk after having an infection, nor was this set forth as an indication in the CDC guidelines.

Dr. Hanlon testified that as an infectious disease specialist, she considers the recommendations of the CDC to be within the prevailing standard of care. Hanlon concurred that plaintiff did not meet any of the CDC criteria; that the vaccine was actually contraindicated during plaintiff's hospitalization because he had an ongoing infection and fever. Moreover, Hanlon further opined that plaintiff's Streptococcus pneumococcal infection did not increase his risk for future infections of that type. Notably, the CDC does not consider prior infection as a risk for additional infection. Hanlon explained that because of the unusual nature of plaintiff's case, that he had a pneumococcal infection from his gallbladder, she advised him that he might consider getting the vaccine after he fully recovered from his infection. This was not an official recommendation; rather, she was merely pointing to something he could consider. Hanlon had no recollection whether she discussed the issue with Aganad. Hanlon maintained that during the entire time plaintiff was hospitalized through the date of his discharge giving the vaccine was contraindicated for plaintiff.

Plaintiff's infectious disease expert witness, Dr. Angelo Scotti, testified that the standard of care required that a patient with a prior pneumoccocal infection receive the vaccine. However, he was unable to cite any textbook, medical article, or publication supporting his assertion. Scotti also maintained that the standard of care for a consultant was to convey his or her expert opinion to the attending or primary care physician, and Hanlon deviated from the standard of care in not informing Aganad that plaintiff should receive the vaccine. Scotti did, however, agree that because a patient should not be given the vaccine while he or she is ill, Hanlon did not deviate from the standard of care by not prescribing the vaccine during plaintiff's hospitalization. Nonetheless, Scotti opined that it was more likely than not that if plaintiff had been given Pneumovax he would not have contracted endocarditis. He further testified that had Dr. Bell administered the vaccine at any time between his treatment of plaintiff from November 2001 through June 2002, plaintiff would not have developed endocarditis. However, Scotti conceded that even individuals who receive the vaccine are not fully protected from contracting the infection again, and that any protection would only be against the 23 strains of the disease.

Plaintiff's internal medicine expert witness, Dr. Samuel Granieri, was also unable to cite any literature to support his opinion that the standard of care required that plaintiff receive the vaccine on the

basis of his prior infection. Granieri conceded that plaintiff did not have any of the risk factors in the CDC guidelines and that the PDR cautions against giving the vaccine to a patient who is already ill. Notwithstanding these concessions, Granieri opined that had Dr. Bell administered the pneumococcal vaccine during his course of treatment, plaintiff would "probably not" have developed his 2002 infection.

Dr. Halina Brukner, an expert witness on behalf of Aganad, testified that the CDC guidelines are the standard of care, and plaintiff did not fit any of the indications. The CDC guidelines do not include previous infection as an indication. Nor was Aganad required to carry out any recommendations offered by a consultant. She further testified that giving the vaccine when a patient is ill or has a suspected ongoing infection would not be within the standard of care. In addition, even had Aganad given the vaccine, plaintiff would not have been completely protected against future infection, but would have been only 65% to 80% protected for the strains included in the vaccine.

Dr. Stephen Sokalski, an expert witness on behalf of Hanlon, testified that the CDC guidelines did not include any indication for giving the vaccine to an otherwise healthy 50-year-old African-American male. Because plaintiff had an active infection during his hospitalization, prescribing the vaccine was absolutely contraindicated. Also, there was no evidence that patients who have had strep pneumococcal infection are benefitted by the vaccine. Sokalski further testified that even if plaintiff were vaccinated, he still could have contracted strep pneumonia. The pneumococcal vaccine, Pneumovax, induces antibodies to 23 particular types of pneumococcus most often associated with the infection, but does not control all infections as there are 57 other types of strains. The vaccine is only 60% effective even for the 23 strains for which it was developed.

After four hours of deliberation, the jury returned a verdict in favor of all defendants. Plaintiffs filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial asserting that the verdict was against manifest weight of the evidence. The circuit court denied the motions, as well as plaintiffs' motion to reconsider. This appeal followed.

## ANALYSIS

Plaintiffs argue that the trial court erred in denying their motion for entry of judgment notwithstanding the verdict or, in the alternative, their motion for a new trial. It is well settled that judgment notwithstanding the verdict should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so

overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513 (1967). Because the standard for entry of judgment notwithstanding the verdict " 'is a high one' [citation], judgment *n.o.v.* is inappropriate if 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' [Citation.]" *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178, 854 N.E.2d 635, 652 (2006). A court of review "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way. [Citations.]" *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992). " 'Thus, the standard for obtaining a [judgment *n.o.v.*] is a " 'very difficult standard to meet' " and [is] limited to " 'extreme situations only.' " [Citations.]' " *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 621-22, 873 N.E.2d 486, 497 (2007), quoting *Alwin v. Village of Wheeling*, 371 Ill. App. 3d 898, 911, 864 N.E.2d 897, 909 (2007), quoting *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 548, 836 N.E.2d 640, 651 (2005). A decision on a motion for judgment notwithstanding the verdict is subject to *de novo* review by this court. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999).

Alternatively, a new trial should be granted only when the verdict is contrary to the manifest weight of the evidence. *York*, 222 Ill. 2d at 178-79, 854 N.E.2d at 652. That standard is met only when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence. *York*, 222 Ill. 2d at 179, 854 N.E.2d at 652, citing *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257. "It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson v. Kamm*, 204 Ill. 2d 1, 35, 787 N.E.2d 796, 815 (2003). A court of review will not reverse a circuit court's decision with respect to a motion for a new trial unless it finds that the circuit court abused its discretion. *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513.

Plaintiffs argue that Aganad's sole reliance on the CDC guidelines was not the appropriate standard of care and that the standard of care required administration of the vaccine to plaintiff because, as an African-American, he was three to five times more likely to contract an infection, and because he was predisposed to contracting another one since he had already suffered an infection. Plaintiffs further argue that Hanlon breached the standard of care in not communicating her comments to Aganad. Defendants Gottlieb Memorial Hospital and

Aganad respond that the evidence showed that the appropriate standard of care was conclusively established as comprised of the CDC guidelines and physician judgment, and that there was compliance with that standard. Defendant Hanlon responds that plaintiffs failed to sustain their burden on the preliminary showing of breach of standard of care, and that even if plaintiffs could have shown such breach, the evidence established lack of proximate causation. We agree with defendants.

We are mindful that the elements of a negligence cause of action are: a duty owed by the defendant to the plaintiff; a breach of that duty; and an injury proximately caused by the breach. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 294, 730 N.E.2d 1119, 1129 (2000), citing *Cunis v. Brennan*, 56 Ill. 2d 372, 374, 308 N.E.2d 617, 618 (1974). In a professional negligence case, " 'the standard of care for all professionals is "the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." ' " *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 816-17, 893 N.E.2d 949, 960 (2008), quoting *Loman v. Freeman*, 229 Ill. 2d 104, 119, 890 N.E.2d 446, 456-57 (2008), quoting *Advincula v. United Blood Services*, 176 Ill. 2d 1, 23, 678 N.E.2d 1009, 1020 (1996). Expert testimony is necessary to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the standard. See *Purtill v. Hess*, 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872 (1986). Where the cause of action sounds in institutional negligence against a hospital for vicarious liability based on the conduct of its medical professionals, the standard of care remains the standard applied to all professionals. *Jones*, 191 Ill. 2d at 298, 730 N.E.2d at 1131, citing *Advincula*, 176 Ill. 2d at 30, 31, 678 N.E.2d at 1024.

In the case *sub judice*, the evidence established that the standard of care was comprised of the CDC guidelines and physician judgment, and that both Aganad and Hanlon complied with the prevailing standard in not prescribing the vaccine. First, the overwhelming weight of the evidence established that the CDC guidelines and physician judgment were the determining factors in deciding whether to administer the vaccine. Plaintiffs' countering expert witness testimony offered no credible alternative standard of care for the administration of the vaccine to plaintiff. "When both parties offer conflicting expert testimony about the appropriate standard of care, the alleged breaches and the proximate cause of injury, the conflicting testimony is sufficient to raise a question of fact that the jury decides." *LaSalle Bank*, 384 Ill. App. 3d at 829, 893 N.E.2d at 970. Here, it is uncontroverted that neither of plaintiffs' experts identified any published text,

treatise, or article to support plaintiffs' assertion that African-Americans or those who have had prior infections are indicated to receive the vaccine. "[A] plaintiff does not discharge this burden of proof by merely presenting expert testimony which offers an opinion as to correct procedure or which suggests, without more, that the witness would have conducted himself differently than the defendant. The expert must base his opinion upon recognized standards of competency in his profession." *Advincula*, 176 Ill. 2d at 24, 678 N.E.2d at 1021.

We further discern that plaintiffs' experts put forth no other recognized standard of care for administration of the pneumococcal vaccine, and instead simply argued against using the CDC guidelines as the sole source of the standard of care. Where there is a "classic battle of the experts," we should not usurp the function of the jury and substitute our judgment. See *Snelson*, 204 Ill. 2d at 36, 787 N.E.2d at 815. See also *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 460-61, 903 N.E.2d 756, 765-66 (2009) (affirmed trial court's denial of plaintiff's motion for judgment notwithstanding the verdict, as the conflicting opinions of the experts were squarely within the province of the jury to resolve, and also affirmed denial of plaintiff's motion for a new trial where it could not be said that the jury's verdict was unreasonable, arbitrary, or unsupported by the evidence so that an opposite conclusion was clearly evident).

Moreover, all witnesses agreed that giving the vaccine was actually contraindicated in plaintiffs' case given the presence of his fever and ongoing active infection, up through the last dates of treatment by Aganad and Hanlon and date of discharge from Gottlieb Memorial Hospital. Nor was there any showing that Aganad's reliance on the PDR in determining that the vaccine was further contraindicated was not within the standard of care. Thus, even if plaintiffs could have somehow established that prescribing the vaccine was initially indicated for plaintiff, it nonetheless remained that Aganad complied with the standard of care in determining that his active infection militated against administering the vaccine.

As to the weight of Aganad's testimony, there was nothing inherently incredible in her assertion that, despite any recommendation from Hanlon, she still would not have administered the vaccine. As plaintiff's primary care physician, she was ultimately responsible for decisions in his treatment. Even had Hanlon informed her of her suggestion regarding the future possibility of receiving the vaccine, the fact remained that, at the time, use of the vaccine was contraindicated. Plaintiffs' experts' testimony as to any increased risk of future infection was wholly unsupported and, therefore, speculative.

With regard to Hanlon specifically, because the standard of care did not envision prescribing the vaccine, she likewise was not required to recommend this course of treatment to Aganad. Nor was there any standard requiring her to inform Aganad of her informal suggestion to plaintiff that he could consider the vaccine in the future. Furthermore, contrary to plaintiffs' assertion, Hanlon did not testify that most infectious disease specialists would have given the vaccine. Actually, the record reveals that upon questioning by plaintiffs' counsel, Hanlon clarified her earlier deposition testimony that she believed most physicians might give the vaccine explaining that she paused during the deposition and "changed direction" because it was "sort of a gray area," not covered by the guidelines. Hanlon testified at trial that she thought "it would be not unusual [sic] for an infectious disease specialist to go beyond the guidelines and suggest it." As such, plaintiffs' repeated assertions that Hanlon "admitted" that most infectious disease physicians would have given the vaccine under the circumstances presented in plaintiff's situation are disingenuous at best. Moreover, Hanlon maintained that her suggestion to plaintiff was not a formal recommendation for treatment. Thus, plaintiffs' evidence at trial failed to establish the threshold element that giving the vaccine was the standard of care.

Plaintiffs' reliance on *Reardon v. Bonutti Orthopaedic Services, Ltd.*, 316 Ill. App. 3d 699, 737 N.E.2d 309 (2000), in support of their argument is misplaced, as *Reardon* actually supports defendants' position. In *Reardon*, all expert physician witnesses but one, a defense expert, opined that the plaintiff suffered from compartment syndrome. *Reardon*, 316 Ill. App. 3d at 711, 737 N.E.2d at 318. Thus, the *Reardon* court determined that the jury's verdict for the defendant was against the manifest weight of the evidence, vacated the judgment, and remanded the matter for a new trial. Likewise, in the case *sub judice* all physician witnesses, with the exception of plaintiffs' experts, agreed that the CDC guidelines and physician judgment were the standard of care, and that prescribing the vaccine was not indicated for African-Americans or persons who had a prior infection. Moreover, all witnesses, including plaintiffs' experts, agreed that giving the vaccine during an active infection was contraindicated. Thus, the manifest weight of the evidence was in defendants' favor that the standard of care did not require giving plaintiff the vaccine.

We further find that, even had plaintiffs succeeded in showing a breach of the standard of care, they failed to establish proximate cause. Plaintiffs point to our supreme court's rejection of the "better result" test and cite to *Holton v. Memorial Hospital*, 176 Ill. 2d 95,

679 N.E.2d 1202 (1997), in support of their argument that defendants' purported negligence in the instant case cost plaintiff a lost chance for a better result. The loss of chance concept refers to the harm resulting to a patient when negligent medical treatment is alleged to have damaged or decreased the patient's chance of survival or recovery, or to have subjected the patient to an increased risk of harm. *Holton*, 176 Ill. 2d at 98, 679 N.E.2d at 1203-04. Although the *Holton* court indeed rejected the "better result" test as a plaintiff's burden of proof, proximate cause still requires plaintiff to prove that defendant's negligence "more probably *** than not" caused plaintiff's injury. *Holton*, 176 Ill. 2d at 107, 679 N.E.2d at 1207. Here there was no linking causal evidence to show that plaintiff's subsequent 2002 infection and resulting endocarditis was more probably than not caused by the defendants' decision to not administer the vaccine in 2000. There was no lost chance because the vaccine was contraindicated in plaintiff's case at the time of his treatment. See *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 975, 691 N.E.2d 1, 7 (1997) (absence of expert testimony that an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to decedent's recovery creates a gap in the evidence of probable cause fatal to plaintiff's case).

Further, all witnesses agreed that the vaccine is not 100% effective. Thus, even if plaintiff had been immunized with the vaccine, he still could have gotten the 2002 infection. More significant, we find there was no evidence that plaintiff's 2002 infection was one of the 23 strains for which the vaccine offers some protection. Thus, even assuming *arguendo* that plaintiffs could have made a showing on breach of the duty of care, as in *Aguilera* this dearth of critical evidence of a causal link is fatal to the element of proximate cause.

Therefore, we find in our *de novo* review that the evidence overwhelmingly favored defendants, and not the plaintiffs, and thus the court's denial of plaintiffs' motion for judgment notwithstanding the verdict was proper. We further find that the jury's verdict was not against the manifest weight of the evidence, and thus the circuit court did not abuse its discretion in denying plaintiffs' motion for a new trial.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court denying plaintiffs' motion for entry of judgment notwithstand-

ing the verdict or for a new trial and denying plaintiffs' motion for reconsideration.

Affirmed.

FITZGERALD SMITH, P.J., and TULLY, J., concur.