No. 2-09-0347    Filed: 5-27-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DAVID W. WILFONG, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 06--L--15 |
| | ) | |
| L.J. DODD CONSTRUCTION and | ) | |
| G. PORTER AND COMPANY, | ) | |
| | ) | |
| Defendants-Appellees | ) | |
| | ) | |
| (Kluber, Skahan and Associates, Inc., and | ) | Honorable |
| Kocurek Concrete Contractors, Inc., | ) | Thomas E. Mueller, |
| Defendants). | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, David W. Wilfong, was injured when he fell while walking across ruts at a construction site. He appeals from the trial court's grant of summary judgment in favor of defendants, L.J. Dodd Construction (Dodd) and G. Porter & Company (Porter). Plaintiff argues that: (1) the trial court erred in ruling that the ruts were open and obvious; (2) the trial court erred in determining that the "distraction exception" did not apply; (3) the trial court erred in ruling that the distraction was not reasonably foreseeable by defendants; (4) even if the ruts were open and obvious, defendants owed him a duty to maintain a safe jobsite pursuant to their contracts with the landowner; and (5) the trial court did not give proper weight to an expert's statement attached to plaintiff's motion to reconsider. We affirm.

I.  BACKGROUND

In November 2004, plaintiff was a project manager for Jones & Brown Company and was assigned to the Churchill Elementary School project in Oswego.  Jones & Brown was a steel fabricator hired by the project owner, Oswego Unit School District 308 (OSD 308).  OSD 308 hired defendant Dodd as the general contractor and defendant Porter as a masonry subcontractor.  Kluber, Skahan & Associates, Inc. (Kluber, Skahan), was the architectural firm for the project, and Kocurek Concrete Contractors, Inc. (Kocurek Concrete), was hired by OSD 308 to pour concrete.

The following facts come from excerpts of depositions contained in the record.  At the time in question, the construction site consisted primarily of the school building under construction and Dodd's job trailer, which was in a paved parking lot about 75 yards west of the school.  Much of the site was very muddy and filled with ruts.  About 20 to 30 feet or 60 to 70 feet from the job trailer was a gravel path that led from the parking lot to the east entrance of the school.  Michael Barr, OSD 308's construction supervisor, testified that Dodd had the path installed after he requested a "smooth walking path" to provide "clear access to the building."  The path satisfied his concerns regarding ground conditions, and he did not think that anything else needed to be done to address the ground conditions.  When asked if there was a designated walkway, Barr replied in the negative and said that there were "several points of access to the building."  On several occasions he had chosen to walk across the ruts rather than take the gravel path.  The number and size of ruts shown in plaintiff's photographs did not look different from other construction sites at that time of year.  Barr further testified that Jones & Brown and Porter were hired directly by OSD 308.

Plaintiff testified in his deposition as follows.  On November 18, 2004, he was participating in a progress meeting in the job trailer.  Plaintiff had been to the jobsite about two to three times a

week for the previous two months to inspect progress. About 20 minutes into the meeting, Neal Dodd (Neal) was concerned whether Jones & Brown had enough "sure connectors" delivered to the site. Sure connectors are welded through decking to allow poured concrete to maintain its structural integrity. Plaintiff called his office, and the person in charge of shipping, Mike Milligan, told plaintiff that they had been delivered and told him the quantity. Neal said that the quantity was insufficient. Plaintiff asked Milligan to check again, and Milligan said that he would. Plaintiff decided to leave the trailer to do a physical count. The discussion in the trailer had been heated, and plaintiff was upset with Milligan for not verifying the number of connectors before plaintiff left the trailer. Plaintiff did not know where the connectors were but "[c]ommon sense *** told [him] that the sure connecters [sic] were inside the building and were protected" from the elements because they came in cardboard boxes. "That's the first thing [he] thought about."

Plaintiff left the trailer at about 9:30 or 10 a.m., and walked over the parking lot, down a grassy area, and down a "drive" that was bare ground with rough terrain but was an access way for vehicles to get to the building. Plaintiff testified that he had to walk in a rut that a truck had made in the drive and that "[f]rom that point on it was at your discretion which way you went. There was no designated path to the job." Plaintiff explained that the rut in which he was walking in the drive did not lead to the building, so he had to keep stepping in and out of different ruts to make his way to the building. He was walking in a normal manner and was not in a hurry.

The ruts plaintiff was walking in were consistent with the tires of the lulls that bricklayers use to carry bricks. The width and shape of the tire tracks, along with plaintiff's experience, allowed him to identify the source of the tracks as a lull. Porter used lulls on this site. The ruts were generally about 8 to 10 inches deep. He could not walk on the "tops" of the ruts, meaning ground

level, because they were unstable; it was like walking on a peak. The ruts themselves went down from ground level. The ruts were a "little hard" because the sun had not come out yet to "soften stuff up." Low areas of the site were damp and muddy, but the inside of the ruts was "firm." He believed that he must have been sidestepping from one rut to the next, because he could not cross over and put two feet in the same rut. When plaintiff was stepping from one rut into the bottom of another rut, the "side of the rut *** gave way" and he lost his balance and turned his right ankle. Just before he fell, he was looking at the ruts and trying to determine his next step.

A few seconds before he fell, Milligan called plaintiff on his cell phone and told him that the quantity of connectors Neal had claimed should be on the site was correct. Plaintiff was on the phone when he fell. Plaintiff was about 25 to 30 yards away from the building and 35 to 40 yards away from the trailer. He was wearing high-top boots with steel toes.

For two or three weeks before the accident, plaintiff had complained about the site's condition because trucks could not get close enough to the building to make proper deliveries. Plaintiff said that the site needed to be scraped because the trucks "needed a level laid out surface to bring our material onto the worksite." Deliveries had to be made about 100 or 150 yards from the building, which was not the usual case for construction sites. Plaintiff believed that leveling ruts was the responsibility of the general contractor, construction manager, or whoever was in charge of safety.

Plaintiff had worked in construction for over 20 years and had 40 hours of a safety training course. The instruction included keeping an eye on the site's ground to watch where you are walking. Plaintiff was familiar with ruts on jobsites and with muddy and rainy conditions, and he was familiar with how to avoid ruts while walking on jobsites. However, this jobsite was

substandard regarding the number, length, and depth of the ruts. As a result of his fall, plaintiff fractured his ankle.

Melvin Greathouse testified that he was the general foreman for DTI, which Jones & Brown had hired as a steel erector. At one of the first progress meetings he was involved in, he told Neal that as the general contractor, Dodd was obligated to provide access with a good road and a level dry area to put the steel down. Greathouse believed that the site's condition was even worse than depicted in plaintiff's photos, and he repeatedly complained about conditions. His workers also complained about the muddy conditions when walking to the building site, because "[b]y the time you would get there *** you would have mud *** halfway up your thighs." In his 40 years as an ironworker, Greathouse had been to about 4,500 jobsites. He had been to a few sites with ruts similar to the Churchill School project, but those had been shut down to fix the ruts, whereas Dodd made little to no attempt to fix these ruts. There was one day Greathouse called off his workers due to site conditions.

Ronald Tucek ran Kocurek Concrete. He testified that they were scheduled to pour concrete on November 17 but had to postpone until the 22nd due to rain. Tucek described the conditions as those of a "normal jobsite," though he also said that it was "pretty muddy" and he was "surprised that they were working in this kind of mud and that the lulls made it through." Ruts such as those depicted in plaintiff's photos were common on construction sites. The only way to avoid ruts was to put down stone, but it was highly doubtful that any construction contractor would do that because of the expense and the impracticality. Tucek explained that the contractor would then have to remove all of the stone to plant grass. On some projects, his company had been hired to grade out ruts similar to the ruts on this site. However, he had never seen grading done on a daily or weekly

basis. Usually, it would be done before a freeze, again in spring after the freeze/thaw cycles, and toward the end of the job. It was a "never-ending battle for ruts" and there was no way for a contractor to avoid them, because anything with rubber tires, especially lulls, would rip up the ground from November until April.

Michael Kjellesvik, the plumber foreman of C.R. Leonard Plumbing & Heating, testified that he and his crew did not have any problems accessing the building due to ground conditions. At one point, "they made us [a] stone sidewalk." The sidewalk was installed because of the mud outside and mud being tracked into the building. It was shown in one of plaintiff's pictures as a muddy gravel path. It went from the parking lot to the building. When Kjellesvik parked near the trailer, he would take the gravel path to the building. The number and size of the ruts shown in plaintiff's photographs were typical for a construction site at that time of year.

John Kennelly, Porter's superintendent, testified that the quantity and size of the ruts shown in plaintiff's photographs looked typical for that stage of the work at that time of year. Edward Mucha, Porter's foreman, similarly testified that the number and size of the ruts depicted in the photographs were typical for that time of year, and he described the site as "in fairly decent shape." Mucha also testified that there was a "stone road" that went from the parking lot "right to the building," which was used to make deliveries to the building.

Steve Freeman of S&K Excavating testified that S&K was on-site at the beginning of the project and at the end to level the ground. Looking at photographs of the site, Freeman stated that it would probably "not do much good" to scrape the site in that condition because it was pretty muddy; his machine probably would not be able to get around in the mud and would be making its own ruts. The ground would first have to "freeze up a little bit." If he leveled out such a muddy site

in the morning and machinery continued to be used on the site, the site probably would return to its previous condition within a few hours. Freeman described pictures of the site as depicting a "typical construction site" in terms of the ground condition and number of ruts. He had seen sites where plywood was laid down for workers to have access to the site.

Plaintiff filed his initial complaint on March 8, 2006. He filed an amended complaint on June 19, 2006. Count I alleged negligence against Dodd. Plaintiff alleged that Dodd had a duty to exercise reasonable care in the operation of the construction site, "including the provision of a safe, suitable and proper ground condition" for him and other workers. Dodd allegedly breached this duty by violating various sections of the Occupational Safety and Health Act (OSHA); failing to make reasonable inspection of the premises and work; improperly managing and maintaining the premises; failing to provide plaintiff with a safe place to work; failing to warn plaintiff of the dangerous conditions; failing to provide adequate safeguards to prevent injury; failing to supervise the work; and failing to maintain the ground of the construction site in a safe manner.

Count II alleged negligence against Porter. Plaintiff alleged that Porter used heavy equipment in the mixing and pouring of concrete and had the authority to order changes in the work that would have prevented the "improperly graded area" caused by its machinery. Count II alleged the same breaches of duty alleged in count I, with the exception of the failure to supervise.

Count III alleged negligence against Kluber, Skahan, and count IV alleged negligence against Kocurek Concrete. Plaintiff voluntarily dismissed these defendants on August 29, 2007.

Dodd filed a motion for summary judgment on August 12, 2008, and Porter filed a motion for summary judgment on September 25, 2008. The trial court granted the motions on January 9, 2009, finding as follows. Defendants generally had a duty to plaintiff to protect against the harm

caused by the unreasonably dangerous condition created by ruts, mud, and water on the construction site. However, an exception to such a duty exists when the danger is open and obvious. In this case, the conditions were open and obvious, and plaintiff had worked in construction for over 20 years and was familiar with the site's conditions. The "distraction exception" to the open-and-obvious doctrine did not apply because defendants did not cause the distraction of plaintiff talking on his cell phone while walking over the ruts and, further, because the distraction was not reasonably foreseeable by defendants. The "deliberate encounter exception" to the open-and-obvious doctrine did not apply because there was an alternative gravel path, which plaintiff admitted existed, and plaintiff chose not to use the path but to instead tackle the ruts.

Plaintiff filed a motion to reconsider on February 3, 2009. The trial court denied the motion on March 13, 2009. Plaintiff timely appealed.

## II. ANALYSIS

Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Murray v. Chicago Youth Center, 224 Ill. 2d 213, 228 (2007). The purpose of summary judgment is to determine whether a question of fact exists, not to make factual findings, and summary judgment should be granted only where the movant's right to it is clear. Forsythe v. Clark USA, Inc., 224 Ill. 2d 274, 280 (2007). We review de novo a grant of summary judgment. Weather-Tite, Inc. v. University of St. Francis, 233 Ill. 2d 385, 389 (2009).

Here, plaintiff alleged negligence against both defendants. The elements of a cause of action for negligence are: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and

(3) an injury proximately caused by the breach. Matthews v. Aganad, 394 Ill. App. 3d 591, 598 (2009). Plaintiff's arguments on appeal relate to the element of duty, and we discuss this area of law in some detail before returning to plaintiff's specific arguments. Whether a duty exists is a question of law to be determined by the court. Bonavia v. Rockford Flotilla 6-1, Inc., 348 Ill. App. 3d 286, 291 (2004). The four factors courts typically consider in determining whether a duty exists are: (1) the reasonable foreseeability of injury; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against injury; and (4) the consequences of placing that burden on the defendant. Grant v. South Roxana Dad's Club, 381 Ill. App. 3d 665, 669 (2008).

We consider the first prong of the duty test, foreseeability, by reference to section 343 of the Restatement (Second) of Torts. LaFever v. Kemlite Co., 185 Ill. 2d 380, 389 (1998). Section 343 states in pertinent part:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts §343 (1965).

Comment d to section 343 provides that "[a]n invitee is entitled to expect that the possessor will take reasonable care to ascertain" the premises' condition and, "having discovered it, either to make it

reasonably safe by repair or give warning of the actual condition and risk involved therein." Restatement (Second) of Torts §343, Comment d, at 217 (1965).

However, an open and obvious condition is a recognized exception to the duty of care set forth in section 343 of the Restatement. LaFever, 185 Ill. 2d at 390. Section 343A(1) of the Restatement addresses this subject, stating in relevant part:

> "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts §343A(1) (1965).

See also Ward v. K mart Corp., 136 Ill. 2d 132, 150-51 (1990) (adopting section 343A). The term "obvious" means that a reasonable person would recognize both the condition and the risk involved. Green v. Jewel Food Stores, Inc., 343 Ill. App. 3d 830, 832 (2003). The determination of whether a condition is open and obvious is an objective test rather than a subjective test. Buchaklian v. Lake County Family Young Men's Christian Ass'n, 314 Ill. App. 3d 195, 203 (2000).

Whether a condition is open and obvious plays a large role in whether a duty exists because it relates to the issues of foreseeabilty and likelihood of injury. Belluomini v. Stratford Green Condominium Ass'n, 346 Ill. App. 3d 687, 691-92 (2004). That is, it is not reasonably foreseeable that someone will be injured by an open and obvious condition because it is assumed that people will appreciate the risks of such a condition and exercise care for their own safety. Belluomini, 346 Ill. App. 3d at 692. Similarly, the likelihood of injury from open and obvious conditions is considered slight because the law assumes that individuals encountering such conditions will appreciate and avoid the risks. Belluomini, 346 Ill. App. 3d at 692.

Plaintiff first argues that whether a condition is open and obvious is a question of fact. As stated, whether a duty exists is a question of law, and this court has held that whether a condition is open and obvious is also a question of law where there is no dispute about the physical nature of the condition. Belluomini, 346 Ill. App. 3d at 692-93; see also Bucheleres v. Chicago Park District, 171 Ill. 2d 435, 455-56 (1996) (Lake Michigan presents an open and obvious risk to individuals diving from concrete seawalls into the lake); Deibert v. Bauer Brothers Construction Co., 141 Ill. 2d 430, 438 (1990) (tire rut outside of portable bathroom was an obvious condition). However, where there is a dispute about the condition's physical nature, such as its visibility, the question of whether a condition is open and obvious is factual. Belluomini, 346 Ill. App. 3d at 693; see also Simmons v. American Drug Stores, Inc., 329 Ill. App. 3d 38, 44 (2002) (whether "cartnapper" barrier outside of drug store presented an open and obvious danger was a factual question); Buchaklian, 314 Ill. App. 3d at 204 (whether defect in mat in locker room was open and obvious was a question of fact).

Plaintiff further argues that the ruts were not open and obvious. Plaintiff argues that the evidence clearly shows that the site was covered in ruts, mud, and standing water. Plaintiff argues that many of the ruts were not visible and were covered with water. Plaintiff's argument is without merit. While plaintiff's photographs show that some of the site, including some ruts, was covered with water, plaintiff's testimony clearly shows that he was aware that he was walking over ruts, stepping from one to another. He characterized the ground at the bottom of the ruts on which he was placing his feet as "firm." He also testified that the ruts he was stepping into did not contain water: "It was just dirt and mud." Plaintiff explained that "in the low areas [of the site] it was damp and muddy. When you're in a rut it was firm."

Plaintiff relatedly argues that the risk that the particular rut he fell in would collapse could not have been known by him or any other reasonable person. Plaintiff argues that some of the ruts on the site were hardened and able to hold workers' weight, and he notes that Barr testified that he had walked across the ruts on several occasions. As stated, whether something is obvious relates to whether a reasonable person would recognize both the condition and the risk involved (Green, 343 Ill. App. 3d at 832), and with this argument plaintiff challenges the risk aspect. However, the question is not whether one particular rut would collapse, but rather whether a reasonable person would anticipate the danger of crossing over the ruts. Here, plaintiff testified that the ruts were 8 to 10 inches deep, the tops of the ruts were unstable, he was looking at the ruts to determine his next step, and he was familiar with how to avoid ruts on a jobsite. A reasonable person in his position would therefore realize that walking across the ruts on the site would present the danger of a rut collapsing or of tripping or otherwise falling. Accordingly, we agree with the trial court that the ruts were open and obvious as a matter of law.

Even if a condition is open and obvious, the landowner may still be liable if he should anticipate the harm despite the condition's obviousness. Restatement (Second) of Torts §343A(1) (1965); Belluomini, 346 Ill. App. 3d at 691. Two such exceptions to the open-and-obvious doctrine are the "distraction exception" and the "deliberate encounter exception." Bonavia, 348 Ill. App. 3d at 292. The former exception refers to a situation where the landowner "has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." Restatement (Second) of Torts §343A(1), Comment f, at 220 (1965); see Ward, 136 Ill. 2d at 153-54 (it was reasonably foreseeable that customers would become distracted while exiting store with large purchases and collide with

post). The latter exception arises when the landowner "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Restatement (Second) of Torts §343A(1), Comment f, at 220 (1965); see LaFever, 185 Ill. 2d at 392 (it was reasonably foreseeable that the plaintiff would walk on slippery fiberglass material while performing his employment obligations).

Plaintiff challenges the trial court's finding that the distraction exception does not apply because he was distracted by his own action in electing to talk on his cell phone while trying to cross the ruts. Plaintiff argues that the distraction exception applies because it is reasonably foreseeable that a worker focusing on his duties, such as speaking on the phone to verify the location of a delivery, could become distracted and not realize that the rut he was stepping on was not strong enough to support him. Plaintiff further argues, in a somewhat contradictory manner, that "there is absolutely no evidence that the use of the cellular telephone distracted him," because his testimony shows that he was looking at the ground and contemplating his next step while he talked on the phone. Plaintiff maintains that he never testified that he was distracted; "[t]hat was Defendants' mischaracterization." Dodd argues that by admitting he was not distracted, plaintiff has thereby conceded that the distraction exception to the open-and-obvious doctrine does not apply. We agree. Cf. Reis v. Aetna Casualty & Surety Co. of Illinois, 69 Ill. App. 3d 777, 785 (1978) (insurance company had duty to defend based on concession in its brief).

In any event, plaintiff's argument is without merit. In general, "[i]n order for the distraction to be foreseeable to the defendant so that the defendant can take reasonable steps to prevent injuries to invitees, the distraction should not be solely within the plaintiff's own creation." Whittleman v.

Olin Corp., 358 Ill. App. 3d 813, 817-18 (2005) (distraction exception did not apply for injuries the plaintiff sustained from high-voltage lines, because the plaintiff alleged only that he was distracted by his work and did not allege that the defendant did anything to cause the distraction or that the layout of the site was distracting); see also Sandoval v. City of Chicago, 357 Ill. App. 3d 1023, 1030-31 (2005) (distraction exception inapplicable where a plaintiff is distracted by his or her own independent acts for which the defendant has no direct responsibility). In this case, to any extent that talking on the cell phone was a distraction to crossing the ruts, plaintiff created that distraction by answering the phone and continuing to walk across the site while talking. Cases relied on by plaintiff are distinguishable because there the defendant had created or contributed to the distraction. See Rexroad v. City of Springfield, 207 Ill. 2d 33, 46 (2003) (the plaintiff student fell in a hole because he was distracted by carrying a football helmet the coach of the defendant school had ordered him to bring); Deibert, 141 Ill. 2d at 439 (the "[d]efendant also created the hazard which caused the distraction"); Ward, 136 Ill. 2d at 153-54 (the defendant sold the plaintiff a large mirror that obscured his view of a post outside the store).

Plaintiff further relies on Clifford v. Wharton Business Group, L.L.C., 353 Ill. App. 3d 34, 45 (2004), where the court held that section 343A does not require proof that the possessor of the land created or controlled the distraction. We agree that there is no single bright-line test for foreseeability. However, the Clifford court also stated that "the distraction exception generally involves a situation where the injured party was distracted from the open and obvious condition because circumstances required him to focus on some other condition or hazard." Clifford, 353 Ill. App. 3d at 43. The court held that the defendant general contractor should have reasonably foreseen that the plaintiff carpenter, whose work on the project required him to look upward, would have his

attention distracted and would fall into a nearby uncovered hole in the floor. Clifford, 353 Ill. App. 3d at 47. In the instant case, by contrast, circumstances did not require plaintiff to walk across the ruts and talk on the phone at the same time. Thus, the trial court did not err in ruling that the distraction exception was inapplicable.

Plaintiff does not argue that the deliberate-encounter exception to the open-and-obvious doctrine applies, thereby forfeiting the issue for review. See 210 Ill. 2d R. 341(h)(7) (points not argued in the appellant's brief are forfeited).

In the end, the open-and-obvious doctrine, along with its exceptions, is simply a means to assist in analyzing the foreseeability and the likelihood of injury. To any extent that those factors are present here, we conclude that the remaining factors in determining whether a duty exists, namely, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on defendants, weigh against imposing a duty under the facts of this case. Although individuals testified that they had seen similar ruts graded, the only depositions from people who had personally been involved in grading ruts showed the impracticality of doing so here. Tucek testified that grading was usually done just before a freeze, again in the spring, and toward the end of a job and that he had never seen grading done on a daily or weekly basis. He testified that it was a "never-ending battle for ruts" because anything with rubber tires, especially lulls, would rip up the ground from November until April. According to Tucek, the only way to avoid ruts was to put down stone, but no contractor would likely do that because it was expensive and the stone would later have to be removed. Freeman testified that the site in the condition shown probably could not be graded, because his machine would not be able to get around in the mud and it would be making its own ruts.

He testified that if he had leveled it in that condition with heavy machinery still present, it probably would return to its previous condition within a few hours.

Further, as plaintiff acknowledges in his brief, the evidence showed that Dodd had a gravel pathway installed. At oral argument, plaintiff argued that the pathway went just from a portable toilet to the building, and not from the parking lot to the building. However, we find no support for this assertion in the record. Indeed, Barr, Kjellesvik, and Mucha all testified that the path went from the parking lot to the building. Plaintiff argues that there were several points of access to the building, and there was "no evidence that workers were directed or required to use the gravel pathway." Plaintiff also argues that defendants could have used plywood boards to cover the ruts. However, considering the open-and-obvious nature of the ruts, the limited effectiveness of grading a site at the time of year at issue, the cost of putting down gravel on the entire site, and the existence of a gravel path leading from the parking lot to at least one building entrance, we conclude that defendants did not have a duty to try to grade the site or create additional pathways with plywood boards.

Plaintiff next argues that even if the ruts were open and obvious, defendants owed him a duty to maintain a safe jobsite pursuant to their contracts with OSD 308. Plaintiff notes that under their respective contracts, defendants are both listed as contractors. Plaintiff relies on identical language in the contracts stating that: (1) "If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences, and procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences, or procedures"; (2) "The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs

in connection with the performance of the Contract"; and (3) "The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to employees on the Work [sic] and other persons who may be affected thereby."

Dodd argues that plaintiff forfeited this argument by failing to raise it in the trial court. However, plaintiff mentioned the contractual provisions in his response to Porter's motion for summary judgment, in argument during the hearing on the summary judgment motions, and again in his motion to reconsider. Accordingly, he has not forfeited the argument on appeal.

Defendants further argue that the contracts did not create a duty toward plaintiff because he was not a third-party beneficiary of the contracts. A strong presumption exists that contracting parties intend that the contract's provisions apply to only them and not third parties. Martis v. Grinnell Mutual Reinsurance Co., 388 Ill. App. 3d 1017, 1020 (2009). An individual who is not a party to a contract may enforce the contract only where the contracting parties intentionally entered into the contract for the individual's direct benefit. Martis, 388 Ill. App. 3d at 1020. Whether someone is a third-party beneficiary depends on the contracting parties' intent, as shown by the contract's language. Martis, 388 Ill. App. 3d at 1020. Even if the contracting parties know, expect, or intend that others will benefit from their agreement, that alone is not sufficient to overcome the presumption that the contract was intended only for the parties' direct benefit. Martis, 388 Ill. App. 3d at 1020. Rather, the contract's language must show that the contract was made for the direct benefit of the third person, and not just for the incidental benefit of that person. Martis, 388 Ill. App. 3d at 1020. "Such an intention must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." Martis, 388 Ill. App. 3d at 1020.

Dodd cites Alaniz v. Schal Associates, 175 Ill. App. 3d 310, 312-13 (1988). There, the plaintiff, a sub-subcontractor's employee, brought suit against the subcontractor and the general contractor for a work-related injury, alleging that he was an intended third-party beneficiary of contracts entered into among the parties. Alaniz, 175 Ill. App. 3d at 311. On appeal, he relied on a provision in a contract between the general contractor and the subcontractor stating that " '[t]he subcontractor *** has the responsibility for maintaining the safety and loss prevention programs covering all work performed by it, and its subcontractors.' " Alaniz, 175 Ill. App. 3d at 311-12. The plaintiff argued that the provision allowed him to maintain an action against the subcontractor for personal injuries caused by unsafe work conditions and equipment. Alaniz, 175 Ill. App. 3d at 312. The court held that the contracting parties did not intend to confer a direct benefit to the plaintiff by including general language about safety and loss-prevention programs. Alaniz, 175 Ill. App. 3d at 312-13. Rather, they intended to benefit just themselves by setting forth their respective responsibilities during construction. Alaniz, 175 Ill. App. 3d at 313. The court stated, "Given the nature of the construction industry and the frequency with which construction injuries occur despite safety precautions, we do not believe the presumption [that parties stipulate for themselves in a contract and not for a third person] has been overcome." Alaniz, 175 Ill. App. 3d at 313. The court further stated:

> "It is not enough that an incidental benefit will flow to third parties; only a direct beneficiary has a right under a contract. [Citation.] We believe that more than the general safety provision found in the contract between [the subcontractor] and [the general contractor] is required to evidence an intent to directly benefit plaintiff. While plaintiff would most likely have received some benefit by implementation of safety programs, such

benefit is incidental to the direct benefit intended for the contracting parties, and thus is not sufficient to allow him to maintain an action on the contract. Plaintiff's action is better characterized as a tort action." Alaniz, 175 Ill. App. 3d at 314-15. Dodd argues that, as in Alaniz, plaintiff may not rely on general safety language to create a contractual duty of care toward him.

Porter argues that no duty was created by its signing a standardized form contract that refers to only safety provisions of a general nature. Porter cites American States Insurance Co. v. A.J. Maggio Co., 229 Ill. App. 3d 422 (1992). There, a subcontractor's insurance company brought suit against the general contractor to recover damages sustained as a result of the subcontractor's employee slipping and falling on ice. The plaintiff alleged that the defendant failed to provide a reasonably safe workplace as required by its contract with the subcontractor. American States Insurance Co., 229 Ill. App. 3d at 423. It relied on a provision stating that the contractor " 'shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to *** employees on the Work and other persons who may be affected thereby.' " American States Insurance Co., 229 Ill. App. 3d at 424-25. The appellate court stated that the contract "imposes a duty of a very general nature to maintain the work area in a reasonably safe condition--a duty no greater than would be imposed at common law on an owner or occupier of the property." American States Insurance Co., 229 Ill. App. 3d at 426. The court further stated that a defendant's duties will not be expanded beyond the scope of duties described in the contract. American States Insurance Co., 229 Ill. App. 3d at 426. The court held that the duty claimed by the plaintiff went beyond the agreement of the parties because the defendant assumed a duty no greater than that which would ordinarily be expected of a landowner, and the contract did not contain an

express provision requiring the removal of snow and ice from the construction site. American States Insurance Co., 229 Ill. App. 3d at 427.

Returning to the specific contractual provisions relied on by plaintiff here, the first one requires the contractor to evaluate and be responsible for the jobsite safety of means, methods, techniques, sequences, or procedures for which the contract documents provide "specific instructions." Plaintiff does not point to any specific instruction in the contract documents requiring defendants to level the ruts or maintain the ground in a certain manner, so he may not rely on this provision to create a duty. The second provision requires the contractor to initiate, maintain, and supervise all safety precautions and programs. This provision is similar to the one at issue in Alaniz. It does not identify plaintiff by name or describe a class to which he belongs and therefore does not confer a third-party-beneficiary status to plaintiff. Instead, as in Alaniz, by using general language about safety precautions and programs, the contracting parties intended to benefit just themselves by allocating their responsibilities on this subject, and any benefit to plaintiff would be incidental rather than direct. The third provision plaintiff relies on requires the contractor to take reasonable precautions for the safety of, and provide reasonable protection to prevent injury to, employees and others on the site. The contractual language is almost identical to that at issue in American States Insurance Co., and under that case, such language does not impose a duty greater than that which is ordinarily owed by a landowner. As we already concluded that defendants did not owe plaintiff a common-law duty under section 343, plaintiff's reliance on this provision fails as well.

Plaintiff additionally argues that his complaint alleges a duty under the theory of construction negligence, which should be viewed under section 414 of the Restatement (Second) of Torts and not solely under section 343. Defendants point out that plaintiff did not raise a section 414 theory of

recovery in the trial court, and Dodd argues that plaintiff thus has forfeited such an argument on appeal. Plaintiff argues that his theory of construction negligence is present in his amended complaint and has been litigated throughout the case. However, we agree that by never raising section 414 in the trial court, plaintiff may not rely on it now to reverse summary judgment. See Norman v. Brandt, 397 Ill. App. 3d 1074, 1079 (2010) (the plaintiffs forfeited their contention that a section of the Restatement applied to the facts of their case, because they raised that section for the first time on appeal).

In any event, section 414 does not save plaintiff's claims. In general, a party that entrusts work to an independent contractor is not liable for that contractor's acts or omissions. Calderon v. Residential Homes of America, Inc., 381 Ill. App. 3d 333, 340 (2008). An exception to this rule is provided by section 414, which states:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414 (1965).

This exception is known as the "retained control exception." Madden v. F.H. Paschen/S.N. Nielson, Inc., 395 Ill. App. 3d 362, 380 (2009). Such liability usually arises where a general contractor subcontracts work but superintends the job himself or through a foreman. Pekin Insurance Co. v. Hallmark Homes, L.L.C., 392 Ill. App. 3d 589, 591 (2009). The general contractor may be vicariously liable for the subcontractor's negligence if it retains control over the operative details of the subcontractor's work, or it may be directly liable for not exercising its supervisory control with

reasonable care. Calderon, 381 Ill. App. 3d at 341; see Restatement (Second) of Torts §414, Comment a, at 387 (1965).

For section 414 to apply:

"[T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment c, at 388 (1965).

"The mere existence of a safety program, safety manual, or safety director is insufficient to trigger this exception." Madden, 395 Ill. App. 3d at 382.

"The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." Downs v. Steel & Craft Builders, Inc., 358 Ill. App. 3d 201, 205 (2005). Porter argues that there is no evidence that there was a contract between it and Jones & Brown and points out that Barr testified that both it and Jones & Brown were hired directly by OSD 308. Porter also argues that there is no evidence that it took an active role in ensuring safety or that it retained control over the incidental aspects of plaintiff's work. Dodd similarly points to the lack of evidence of contracts between it and Porter and it and Jones & Brown, and Dodd argues that it is impossible to know the extent of control, if any, that it had over either Porter's or plaintiff's work. We agree that the lack of evidence of a contract between the respective companies

undermines plaintiff's argument. Cf. Moiseyev v. Rot's Building & Development, Inc., 369 Ill. App. 3d 338, 351 (2006) (considering a lack of a contract between the general contractor and subcontractor as evidence of no duty under section 414). Even if we construe the contracts between defendants and OSD 308 as giving defendants a general right to ensure that safety precautions were being exercised and that work was done in a safe manner, there is no indication that they had control over the means and methods of an independent contractor's work, as is required to prevail under a section 414 claim. See Ross v. Dae Julie, Inc., 341 Ill. App. 3d 1065, 1071 (2003). In other words, there is no evidence that Dodd controlled the operative details of Porter's work or that Porter was not free to do its work in its own way. See Joyce v. Mastri, 371 Ill. App. 3d 64, 75-76 (2007). The evidence also shows that defendants did not control plaintiff's work. Accordingly, plaintiff's reliance on section 414 is not persuasive.

Last, plaintiff argues that the trial court failed to give proper weight to the "Statement of Opinions" of Kenneth Yotz, which was attached to plaintiff's motion to reconsider. Plaintiff's motion to reconsider stated that Yotz: was the senior vice president of Environmental, Management and Training Systems, Inc.; had over 38 years of experience in the construction industry; and specialized in occupational and environmental health and safety issues. In the signed "Statement of Opinions," Yotz opined that: Dodd controlled the work performed by Jones & Brown and plaintiff; Porter created the hazardous ruts with its lulls; defendants failed to conduct frequent and regular inspections of the jobsite, as required by OSHA standards; and Dodd failed to maintain access and pedestrian roads, to maintain means of egress free of impediments, and to clear passageways for the safe movement of workers, all in violation of OSHA standards. Yotz opined that these failures were the proximate cause of plaintiff's fall and resulting injuries.

Defendants argue that the trial court properly disregarded Yotz's statement because it was substantially insufficient under Supreme Court Rule 191 (210 Ill. 2d R. 191), which states in relevant part:

"Affidavits in support of and in opposition to a motion for summary judgment under section 2--1005 of the Code of Civil Procedure *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 210 Ill. 2d R. 191.

Defendants argue that Yotz's statement did not list the facts upon which Yotz based his opinions or include copies of all the papers on which Yotz relied. See Robidoux v. Oliphant, 201 Ill. 2d 324, 334-35, 339-40 (2002) (under the plain language of Rule 191, affidavits submitted in support of or in opposition to summary judgment must consist of facts admissible in evidence rather than conclusions, and they must have any supporting papers attached). Defendants also argue that contrary to Rule 191, Yotz's statement does not qualify as an affidavit because it does not appear that he took an oath. See Robidoux, 201 Ill. 2d at 343 (affidavit under Rule 191(a) does not need to be verified, but the affiant's name must appear as one who has taken an oath). Defendants point out that they objected to the statement at the hearing on plaintiff's motion to reconsider.

Plaintiff notes that in his initial response to the summary judgment motions, he attached a Rule 191 affidavit signed by his attorney. Plaintiff's attorney averred that although the parties were not yet required to disclose opinion witnesses, he had discussed the case with several potential expert

witnesses, and at the time of trial, plaintiff would present expert testimony regarding the violations of applicable OSHA standards and other standards accepted in the construction industry. Plaintiff argues that Yotz's affidavit was intended to supplement his attorney's affidavit, and he points out that the trial court did not strike Yotz's statement.

Defendants counter that regardless of Rule 191 compliance, there is no reason Yotz's statement could not have been submitted earlier, in time for the initial decision on summary judgment.

We agree with defendants' position. A motion to reconsider is meant to bring to the trial court's attention newly discovered evidence not available at the prior hearing, changes in the law, or errors in the trial court's application of existing law. Caywood v. Gossett, 382 Ill. App. 3d 124, 133 (2008). A ruling on a motion to reconsider is typically reviewed for an abuse of discretion, but a motion to reconsider a grant of summary judgment typically questions the trial court's application of existing law, and the denial of such a motion is reviewed de novo. Duresa v. Commonwealth Edison Co., 348 Ill. App. 3d 90, 97 (2004). To the extent that plaintiff sought to have Yotz's statement considered as newly discovered evidence, it would not qualify because there is no indication that it was not available prior to the hearing on the motions for summary judgment. See Landeros v. Equity Property & Development, 321 Ill. App. 3d 57, 65 (2001). " 'Trial courts should not allow litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling.' " Landeros, 321 Ill. App. 3d at 65, quoting Gardner v. Navistar International Transportation Corp., 213 Ill. App. 3d 242, 248 (1991). The statement would also not qualify as a supplement to plaintiff's attorney's affidavit because, in addition to the fact that it was from a different individual, even a revised expert affidavit would have to contain newly

discovered evidence in order to be proper for a motion to reconsider. See Landeros, 321 Ill. App. 3d at 66. Finally, as Dodd points out, Yotz relies on OSHA regulations, but OSHA regulations in and of themselves do not create a duty of care. Recio v. GR-MHA Corp., 366 Ill. App. 3d 48, 58 (2006). Accordingly, the trial court did not err in according little or no weight to Yotz's statement, or in denying plaintiff's motion to reconsider.

### III. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err in granting summary judgment for defendants or in denying plaintiff's motion to reconsider. We therefore affirm the judgment of the circuit court of Kendall County.

Affirmed.

McLAREN and JORGENSEN, JJ., concur.